# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

TEMPAY INC.,
an Ohio corporation,

   Plaintiff,

v.             Case No. 8:11-cv-02732-JSW-AEP

BILTRES STAFFING OF TAMPA
BAY, LLC, a Florida limited liability
company, OTTO BILTRES and
CONSTANDINA I. BILTRES,
individuals, and PFG LOANS, INC.,
a California corporation,

   Defendants.

_____/

## PLAINTIFF'S AMENDED VERIFIED COMPLAINT
## FOR INJUNCTIVE RELIEF AND DAMAGES

   Plaintiff, TemPay Inc. ("TemPay") sues Defendants, Biltres Staffing of Tampa Bay, LLC ("Biltres Staffing"), Otto Biltres and Constandina I. Biltres (collectively the "Biltres Defendants"), and PFG Loans, Inc. ("PFG") and states:

### JURISDICTION AND VENUE

   1.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Ohio, Biltres Staffing and the Biltres Defendants are citizens of Florida, and PFG Loans, Inc. is a citizen of California.  Further, the amount in controversy exceeds $75,000, exclusive of interest and costs.

   2.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

3.      TemPay is an Ohio corporation specializing in payroll funding and accounts receivable factoring, with its principal place of business in Ohio.

4.      Biltres Staffing is a Florida limited liability company.  It is purportedly a full service temporary staffing company with its principal place of business in Florida.

5.      Otto Biltres is an individual who is a citizen of Florida, and is domiciled in Tarpon Springs, Pinellas County, Florida.  Upon information and belief, Otto Biltres is the President of Biltres Staffing.

6.      Constandina Biltres is an individual who is a citizen of Florida, and is domiciled in Tarpon Springs, Pinellas County, Florida.  Constandina Biltres is the wife of Otto Biltres and is a manager/member of Biltres Staffing.

7.      PFG is a California corporation with its principal place of business in California.

8.      On or about March 27, 2008, TemPay and Biltres Staffing entered into a Master Factoring Agreement (the "March 2008 Agreement"), whereby Biltres Staffing agreed to sell, and TemPay agreed to purchase, certain accounts receivable of Biltres Staffing.  Otto Biltres signed the March 2008 Agreement as President of Biltres Staffing, and both Otto and Constandina Biltres personally guaranteed the March 2008 Agreement.  A true and correct copy of the March 2008 Agreement is attached hereto as **Exhibit A.**

9.      From the inception of the parties' relationship, both the number of invoices submitted by Biltres Staffing and the invoice balances for the accounts purchased by TemPay increased steadily each month.

10.     On or about April 20, 2011, TemPay and Biltres Staffing entered into a Master Factoring Agreement (the "April 2011 Agreement"), whereby Biltres Staffing again agreed to

2

sell, and TemPay agreed to purchase, certain accounts receivable of Biltres Staffing.  Otto Biltres signed the April 2011 Agreement as President of Biltres Staffing, and both Otto and Constandina Biltres again personally guaranteed the April 2011 Agreement.  A true and correct copy of the April 2011 Agreement is attached hereto as **Exhibit B.**

11.     Pursuant to the April 2011 Agreement, TemPay and Biltres Staffing have an advance factoring relationship.  As such, TemPay provides financing to Biltres Staffing in the form of a cash advance in the amount of 85% of the purchased receivables.  The balance of the invoice amount is paid to Biltres Staffing, less TemPay's commission and other charges, upon payment of the invoice in full to TemPay.

12.     After the parties entered into the April 2011 Agreement, TemPay purchased receivables from four of Biltres Staffing's purported customers: Aluminum Coils, Inc., Lennar Manufacturing, Inc., Miller Contracting, Inc., and RBA Print Communications (collectively the "Biltres Staffing customers").

13.     After TemPay advanced 85% of the weekly invoices from the four customers to Biltres Staffing (as determined by invoices and supporting documentation submitted to TemPay by Otto Biltres), TemPay typically received full payment on those invoices 45 to 60 days later. Payment of the invoices was made through checks purportedly from the customer, forwarded to TemPay by Otto Biltres.

14.     Pursuant to Section 12.1 of the April 2011 Agreement, TemPay is irrevocably appointed Biltres Staffing's attorney-in-fact, and is given full authority, from time to time in TemPay's discretion, to take any action and to execute any instrument which TemPay may deem necessary to accomplish the purposes of the April 2011 Agreement.  This authority includes, but is not limited to, authority to sign in the name of and on behalf of Biltres Staffing, any document

to pledge and collect the Assigned Accounts and other Collateral; to verify with customers all Assigned Accounts; to send various requests to customers; to ask, demand, collect, sue for, or otherwise recover monies due under the Assigned Accounts; to receive, endorse and collect any drafts or documents; and file any claims or take any action for the collection of the Collateral.

15.     Pursuant to Section 5 of the April 2011 Agreement, Biltres Staffing granted TemPay a continuing security interest in all of Biltres Staffing's right, title and interest in and to Biltres Staffing's Collateral, which includes but is not limited to, the Assigned Accounts and all other Accounts, equipment and inventory, deposit accounts, certificates of deposit, and notes.  In connection with said security interest, Biltres Staffing consented to the signing and filing by TemPay of any and all necessary UCC financing statements.  True and correct copies of the UCC Financing Statements filed by TemPay related to Biltres Staffing are attached hereto as **Composite Exhibit C.**

16.     Several months after the parties executed the April 2011 Agreement, Otto Biltres approached TemPay and requested an increase in the cash advance percentage, and asked that his wife be removed as a guarantor of the April 2011 Agreement, claiming that she no longer had any involvement and/or interest in Biltres Staffing.

17.     As of October 10, 2011, Biltres Staffing owed TemPay $3,294,953.14, a significant portion of which remains unpaid.  Constandina Biltres, at a minimum, is personally liable for this amount owed as of October 10, 2011.

18.     On or about October 10, 2011, TemPay and Biltres Staffing entered into a Master Factoring Agreement (the "October 2011 Agreement").  Pursuant to the October 2011 Agreement, the cash advance percentage increased to 90% and Constandina Biltres was removed as a guarantor of the Agreement.  Otto Biltres signed the October 2011 Agreement as President

4

of Biltres Staffing, and personally guaranteed the performance of the October 2011 Agreement. A true and correct copy of the October 2011 Agreement is attached hereto as **Exhibit D.**

19.     Shortly after entering into the October 2011 Agreement, TemPay became suspicious of Otto Biltres' business activities.  Specifically, Biltres Staffing's invoices for the Biltres Staffing customers continued to increase weekly, with no periodic variation in the amount of business Biltres Staffing was bringing in or in the amount of employees Biltres Staffing was placing with the four customers.

20.     Further, several weeks ago Otto Biltres contacted Brian Keuper, Client Relations Manager of TemPay, to inform him that two customer payments would not clear.

21.     TemPay then began an investigation into Biltres Staffing and Otto Biltres.  In connection with said investigation, TemPay asked Otto Biltres for contact information for the Biltres Staffing customers so TemPay could contact the customers directly to discuss their accounts.

22.     In response, Biltres provided email addresses for employees who allegedly worked for the Biltres Staffing customers.  Specifically, Biltres provided contact information for "Marty Jones," who allegedly worked at RBA Print Communications, for "JoAnne Wilson," who allegedly worked for Aluminum Coils, Inc., for "Sharon Beverly," who allegedly worked for Lennar Manufacturing, a division of Lennar Homes, and for "Ray Augustine," who allegedly worked for Miller Contracting.

23.     When TemPay contacted the employees using the contact information provided by Otto Biltres, the purported employees affirmed that they had outstanding invoices with Biltres Staffing and confirmed the amounts due and owing.

24.     Despite assurances from the purported employees, TemPay remained wary. When TemPay received the next payment from Miller Contracting, it noticed that the account number on the check was identical to the account number TemPay had on file for Biltres Staffing.  Indeed, the account number listed for Miller Contracting is the very account into which TemPay wires Biltres Staffing's weekly cash advance payments.

25.     After discovering these discrepancies, TemPay began to dig deeper.  To aid in the investigation, TemPay independently obtained contact information for the Biltres Staffing customers.   When TemPay contacted the Biltres Staffing customers using the contact information TemPay independently obtained, none of them had ever heard of Otto Biltres, had ever worked with Biltres Staffing, and had no record of the employees Otto Biltres identified. True and correct copies of correspondence received from RBA Print Communications and Aluminum Coils, Inc. denying a relationship with Biltres Staffing are attached hereto as **Composite Exhibit E.**

26.     TemPay then discovered that Otto Biltres filed fictitious name notifications in Florida for RBA Print Communications and Aluminum Coils.  Copies of said fictitious name filings are attached hereto as **Composite Exhibit F.**

27.     TemPay also determined that Otto Biltres owns the "customer" email addresses he provided to TemPay, and that "Marty Jones," "JoAnne Wilson" and "Sharon Beverly" are actually employees of Biltres Staffing and/or Otto Biltres.

28.     Further, TemPay discovered that all of the purported Biltres Staffing customers maintain bank accounts at Bank of America, and upon information and belief, all of said accounts are owned and/or controlled by Otto Biltres and/or Constandina Biltres.  Based on Otto Biltres' representations that he is currently unable to repay the monies owed TemPay from said

accounts, TemPay strongly believes Defendants have already dissipated and/or converted said monies and other assets.

29.     Despite Otto Biltres' false representations that his wife no longer has any interest and/or involvement in Biltres Staffing, Constandina Biltres remains the only listed manager/member of Biltres Staffing.  A copy of Biltres Staffing's Florida Department of State, Division of Corporations limited liability filing is attached hereto as **Exhibit G.**

30.     When confronted by TemPay, Biltres denied any knowledge of the fraudulent invoices, bank accounts, fictitious name filings, or the fictitious employees.

31.     However, following TemPay's investigation, it is now clear that the Biltres Defendants have engaged in a long term scheme to defraud TemPay.

32.     The Biltres Defendants' total current outstanding balance is $2,929,286.64, with a total currently owed to TemPay of $2,706,455.69.

33.     All conditions precedent to the institution and maintenance of this action have occurred, have been performed, or have been waived.

### COUNT I: FRAUD
#### (As to Otto Biltres, Constandina Biltres and Biltres Staffing)

34.     TemPay realleges the allegations of paragraphs 1 through 33 as though fully set forth herein.

35.     This is an action for fraud against the Biltres Defendants.

36.     The Biltres Defendants knowingly made numerous false statements to TemPay concerning material facts.

37.     Specifically, the Biltres Defendants fraudulently represented that Aluminum Coils, Inc., Lennar Manufacturing, Inc., Miller Contracting, Inc., and RBA Print Communications were customers of Biltres Staffing.

38.     In fact, these entities are not customers of Biltres Staffing. With respect to some of these alleged customers, the Biltres Defendants, in an effort to deceive TemPay, registered fictitious names to perpetrate their fraud.

39.     Further, throughout the parties' relationship, Defendants knowingly prepared and provided fraudulent invoices from the Biltres Staffing customers to induce TemPay to purchase said invoices.[1]   In actuality, none of the Biltres Staffing customers were independent companies that did business with Biltres Staffing and, and as such, did not owe the amounts listed on the invoices.  The invoices were pure fraud created by Defendants to swindle money from TemPay.

40.     Otto Biltres and/or Constandina Biltres knowingly and intentionally invented the Biltres Staffing customers and fraudulent invoices to induce TemPay to enter into the April 2011 Agreement and later, the October 2011 Agreement.  Further, the Biltres Defendants used the fraudulent customers and invoices to secure a more favorable cash advance percentage from TemPay, and to induce TemPay to agree to remove Constandina Biltres as a guarantor of the Agreement, thereby reducing the potential personal liability of Otto and Constandina Biltres.

41.     In furtherance of his fraudulent scheme, Otto Biltres provided false employee names and contact information to TemPay.  Otto Biltres informed or directed the purported employees to inform TemPay that the Biltres Staffing customers did in fact do business with and owe Biltres Staffing the amounts indicated on the falsified invoices.

42.     The Biltres Defendants created and maintained numerous different bank accounts at Bank of America, including but not limited to, accounts in the names of each of the Biltres Staffing customers.  The Biltres Defendants held, owned and controlled all of these accounts into

---

[1]In connection with these invoices, the Biltres Defendants affirmed, through executing the Agreement, that "[a]ll documents relating to the [Biltres Staffing customers] are genuine and constitute the legally valid and binding obligations of the parties thereto."

which TemPay transferred its cash advances, and from which the Biltres Staffing customers purportedly paid their invoices to TemPay.

43.     Due to the fraud perpetrated in connection with the bank accounts owned and/or controlled by the Biltres Defendants, there is a high likelihood that Defendants have transferred, hidden or otherwise disposed of the funds deposited by TemPay in those accounts, or that they will do so in the near future.

44.     The Biltres Defendants knew that each of the above actions and statements were false.

45.     The Biltres Defendants intended for their false statements and misrepresentations to induce TemPay to enter into the April 2011 Agreement and later, the October 2011 Agreement, to remove Constandina Biltres as a Guarantor of the Agreement, to purchase the Biltres Staffing customers' accounts, to provide cash advances for the fraudulent invoices and to take other action to its detriment.

46.     TemPay relied on the Biltres Defendants' false representations and actions to its detriment.

47.     In knowingly making the false statements of material fact, Otto Biltres acted in his individual capacity as well as in his capacity as an authorized agent of Biltres Staffing and Constandina Biltres.

48.     As a direct and proximate result of Defendants' fraud, TemPay has been damaged.

49.     Injunctive relief is necessary and proper because there is a substantial likelihood that Defendants will attempt to dispose of or hide the money TemPay provided to Biltres Staffing, which rightly belongs to TemPay.

50.     The issuance of an injunction will prevent irreparable harm to TemPay and will not cause unfair loss to Defendants or result in any injury or inconvenience to the public.

WHEREFORE, TemPay respectfully requests that this Court: (1) enter an emergency temporary injunction directing that Defendants: (a) refrain from directly or indirectly spending, moving, transferring, secreting, assigning, conveying, destroying, encumbering, liquidating, mortgaging, selling, or in any other manner disposing of assets resulting from the money paid by TemPay to Biltres Staffing, specifically including but not limited to, the monies in any of the Bank of America or other accounts; and (b) freeze all accounts and assets owned and/or controlled by Biltres Staffing, Otto Biltres and/or Constandina Biltres, including but not limited to, any accounts at Bank of America; (2) enter judgment against the Biltres Defendants, together with all damages, costs, prejudgment interest, and (3) order such other and further relief as this Court deems appropriate and just.

### COUNT II: FRAUD IN THE INDUCEMENT
### (As to the October 2011 Agreement)

51.     TemPay realleges the allegations of paragraphs 1 through 33 as though fully set forth herein.

52.     This is a cause of action for fraud in the inducement against the Biltres Defendants, seeking to set aside the October 2011 Agreement.

53.     Defendants have committed multiple acts of fraud in connection with the October 2011 Agreement.

54.     Specifically, Defendants falsely represented that Aluminum Coils, Inc., Lennar Manufacturing, Inc., Miller Contracting, Inc., and RBA Print Communications were customers of Biltres Staffing.

55.     Further, throughout the parties' relationship, Defendants knowingly prepared and provided fraudulent invoices from the Biltres Staffing customers to induce TemPay to purchase said invoices.

56.     Otto Biltres and/or Constandina Biltres knowingly and intentionally invented the Biltres Staffing customers and fraudulent invoices to induce TemPay to enter into the October 2011 Agreement.  The Biltres Defendants used the fraudulent customers and invoices to secure a more favorable cash advance percentage from TemPay, and to induce TemPay to agree to remove Constandina Biltres as a guarantor of the Agreement, thereby reducing the potential personal liability of Otto and Constandina Biltres.

57.     In knowingly making the false statements of material fact, Otto Biltres acted in his individual capacity as well as in his capacity as an authorized agent of Biltres Staffing and Constandina Biltres.

58.     Defendants' intended for their false statements of material fact to induce TemPay to enter into the October 2011 Agreement and to remove Constandina Biltres as a guarantor of the Agreement.

59.     But for Defendants' false statements, TemPay would not have entered into the October 2011 Agreement.

60.     TemPay relied on Defendants' false representations to its detriment.

61.     As a direct and proximate result of Defendants' fraud, TemPay has been damaged.

WHEREFORE, TemPay respectfully requests that this Court enter an order rescinding the October 10, 2011 Agreement, enter judgment against the Biltres Defendants, together with all

damages, costs and prejudgment interest, and for such other and further relief as this Court deems appropriate and just.

## COUNT III: BREACH OF CONTRACT
### (Biltres Staffing)

62.    TemPay realleges the allegations of paragraphs 1 through 33 as though fully set forth herein.

63.    This is a cause of action for breach of the April 2011 Agreement against Biltres Staffing.

64.    Biltres Staffing breached the April 2011 Agreement by failing and refusing to pay the amounts due and owing TemPay despite request to do so.

65.    As a result of Biltres Staffing's breaches as alleged herein, TemPay has been damaged.

WHEREFORE, TemPay respectfully requests that this Court enter judgment against Biltres Staffing, together with all damages, costs, prejudgment interest, and for such other and further relief as this Court deems appropriate and just.

## COUNT IV: BREACH OF GUARANTY
### (Otto Biltres)

66.    TemPay realleges the allegations of paragraphs 1 through 33 as though fully set forth herein.

67.    This is a cause of action for breach of the April 2011 Guaranty against Otto Biltres.

68.    Otto Biltres breached the April 2011 Guaranty by failing to make payments owed by Biltres Staffing to TemPay despite request to do so.

69.     As a result of Otto Biltres' breaches as alleged herein, TemPay has been damaged.

WHEREFORE, TemPay respectfully requests that this Court enter judgment against Otto Biltres, together with all damages, costs, prejudgment interest, and for such other and further relief as this Court deems appropriate and just.

**COUNT V: BREACH OF GUARANTY**
**(Constandina Biltres)**

70.     TemPay realleges the allegations of paragraphs 1 through 33 as though fully set forth herein.

71.     This is a cause of action for breach of the April 2011 Guaranty against Constandina Biltres.

72.     Constandina Biltres breached the April 2011 guaranty by failing to make payments owed by Biltres Staffing to TemPay despite request to do so.

73.     As a result of Constandina Biltres' breaches as alleged herein, TemPay has been damaged.

74.     Constandina Biltres is liable for amounts due and owing TemPay through and including October 10, 2011, and to the extent TemPay prevails on its fraud count, is liable for the total amount currently due and owing TemPay.

WHEREFORE, TemPay respectfully requests that this Court enter judgment against Constandina Biltres, together with all damages, costs, prejudgment interest, and for such other and further relief as this Court deems appropriate and just.

## COUNT VI: VIOLATION OF THE FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### (As to Otto Biltres, Constandina Biltres and Biltres Staffing)

75.     TemPay realleges the allegations of paragraphs 1 through 33 as though fully set forth herein.

76.     This is a cause of action against Defendants for violations of the Florida Deceptive and Unfair Trade Practices Act, *Fla. Stat.* § 501.201, *et seq.*

77.     Defendants have knowingly and intentionally committed unfair and/or deceptive acts in connection with their business transactions with TemPay.  Specifically, as alleged herein, Defendants committed numerous acts of fraud in connection with the April 2011 and October 2011 Agreements with TemPay, including but not limited to, false representations regarding Biltres Staffing customers, invoices from said customers, misrepresentations regarding the customers' purported employees, and fraud in connection with various bank accounts held by Defendants.

78.     As a direct and proximate result of Defendants' conduct, TemPay has been damaged and will continue to suffer damages if not awarded injunctive relief.

79.     TemPay's injuries are not fully compensable by monetary damages and thus, also warrant injunctive relief.

80.     TemPay has retained the undersigned counsel and is entitled to its reasonable attorneys' fees and costs pursuant to *Fla. Stat.* § 501.2105.

WHEREFORE, TemPay respectfully requests that this Court: (1) enter an emergency temporary injunction directing that Defendants: (a) refrain from directly or indirectly spending, moving, transferring, secreting, assigning, conveying, destroying, encumbering, liquidating, mortgaging, selling, or in any other manner disposing of assets resulting from the money paid by

TemPay to Biltres Staffing, specifically including but not limited to, the monies in any of the Bank of America or other accounts; and (b) freeze all accounts and assets owned and/or controlled by Biltres Staffing, Otto Biltres and/or Constandina Biltres, including but not limited to, any accounts at Bank of America; (2) enter an order preliminarily and permanently enjoining Defendants from engaging in the unfair, deceptive and fraudulent trade practices set forth herein; (3) enter judgment against Defendants, together with all damages, attorneys' fees, costs, prejudgment interest; and (4) order such other and further relief as this Court deems appropriate and just.

## COUNT VII: FRAUDULENT TRANSFER – ACTUAL FRAUD
### (As to the Biltres Defendants and PFG Loans, Inc.)

81.     TemPay realleges the allegations of paragraphs 1 through 33 as though fully set forth herein.

82.     This is a cause of action for fraudulent transfer against the Biltres Defendants and PFG pursuant to *Fla. Stat.* § 726, et seq.

83.     Over the past several years, the Biltres Defendants have transferred virtually all of their personal funds, and Biltres Staffing's business funds, to various accounts and recipients with intent to hinder, delay and defraud TemPay.

84.     On November 30, 2011, December 1, 2011 and again on December 8, 2011 the Biltres Defendants transferred approximately $31,565.73 to their mortgage company, PFG, to pre-pay their mortgage through October, 2012 (collectively, the "Transfers").  Evidence of the transfers is attached hereto as **Composite Exhibit H**.

85.     The Transfers were made with actual intent to hinder, delay, or defraud TemPay, a creditor to which the Biltres Defendants were and are indebted.

15

86.     The Biltres Defendants' actual fraudulent intent to hinder, delay or defraud TemPay by the Transfers is evidenced by, among other things, the fact that the Biltres Defendants made the transfers as part of an elaborate and continuing scheme to render themselves judgment proof at the expense of TemPay and to continue to allow them to live lavishly off funds wrongfully obtained from TemPay.

87.     At all times, the Biltres Defendants had actual creditors.

WHEREFORE, TemPay requests entry of judgment against the Biltres Defendants and PFG avoiding the Transfers pursuant to Florida Statutes § 726.105, and the costs of this action.

## COUNT VIII: VIOLATION OF THE FLORIDA RICO ACT
### (As to Otto Biltres, Constandina Biltres and Biltres Staffing)

88.     TemPay realleges the allegations of paragraphs 1 through 33 and 36-48 as though fully set forth herein.

89.     This is an action pursuant to *Fla. Stat.* Chapter 895, et seq., asserting a statutory right of action against Biltres Staffing and the Biltres Defendants for their conduct of, or participation in, an enterprise through a pattern of racketeering activity in violation of § 895.03, Florida Statutes.

90.     Section 895.03(1) makes it unlawful for any person who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation or any enterprise.

16

91.     Section 895.03(2) makes it unlawful for any person, through a pattern of racketeering activity or through the collection of any unlawful debt, to acquire or maintain, directly or indirectly, any interest or control of any enterprise of real property.

92.     Section 895.03(3) makes it unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity.

93.     Pursuant to § 895.02(1), racketeering activity includes committing, attempting to commit, conspiring to commit, and/or soliciting, coercing, or intimidating another person to commit any crime chargeable by indictment or information under certain provisions of the Florida Statutes as well as any conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1).

94.     At all time periods relevant hereto, Biltres Staffing and the Biltres Defendants devised and engaged in a long-standing, structured scheme whereby they wrongfully obtained funds from TemPay to the direct injury to the business and property of TemPay.

95.     Biltres Staffing and the Biltres Defendants are persons within the meaning of § 895.03, Florida Statutes.

96.     At all times material to this Amended Complaint, Biltres Staffing and the Biltres Defendants constituted an "enterprise" as defined by § 895.02(3), Florida Statutes.   From March 27, 2008 until at least November 29, 2011, Biltres Staffing and the Biltres Defendants acted in concert to knowingly and intentionally conduct and participate, directly and indirectly, in fraudulent activity through a pattern of racketeering activity as defined in § 895.02(4), Florida Statutes.

97.     Such racketeering activity consisted of illegal acts defined as predicate acts of RICO liability under *Fla. Stat.* § 895.02, including, but not limited to, fraudulent practices pursuant to Chapter 817, Florida Statutes, forgery and counterfeiting pursuant to Chapter 831, Florida Statutes, mail and wire fraud as described in 18 U.S.C. §§ 1341 and 1343, and using a false or fictitious name in violation of 18 U.S.C. § 1342.

98.     Specifically, in furtherance of Defendants' scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses and representations, Biltres Staffing and the Biltres Defendants falsely represented themselves as officers and/or agents of the Biltres Staffing Customers and received property intended for those companies with intent to convert said property to their own use, and made false statements to TemPay with a fraudulent intent to obtain said property, in violation of *Fla. Stat.* §§ 817.02 and 817.03.

99.     In addition, Biltres Staffing and the Biltres Defendants fraudulently affixed the signature of an officer and/or agent of the Biltres Staffing Customers to the purported payments, and possessed and provided false checks for payment to TemPay, in violation of *Fla. Stat.* §§ 831.06-831.09

100.    Biltres Staffing and the Biltres Defendants also transmitted or caused to be transmitted by means of interstate mail and/or private or commercial interstate carrier the fraudulent invoices and the purported payments by the Biltres Staffing customers, in violation of 18 U.S.C. § 1341.

101.    Moreover, in connection with the transmission of the fraudulent invoices, Biltres Staffing and the Biltres Defendants used, assumed and/or requested to be addressed by a fictitious, false or assumed name, and/or took or received from the post office or authorized

depository of mail, mail addressed to such fictitious, false or assumed name or address, in violation of 18 U.S.C. § 1342.

102.    Further, Biltres Staffing and the Biltres Defendants transmitted or caused to be transmitted by means of interstate wire the payments fraudulently obtained from TemPay, in violation of 18 U.S.C. § 1343.

103.    Biltres Staffing and the Biltres Defendants played separate roles in the scheme but, at all time periods relevant hereto, they acted in concert as a continuing unit. Both Biltres Staffing and the Biltres Defendants organized, operated, and masterminded the fraudulent scheme to submit the fraudulent invoices to TemPay and to otherwise corruptly benefit from their enterprise and racketeering activity.

104.    Each Defendant conducted or participated in the fraudulent activity and played a role in the management and operation of the fraudulent activity through a pattern of racketeering activities.

105.    The commission of the predicate acts is a regular way of conducting Biltres Staffing's ongoing business and participating in the ongoing fraudulent activity.

106.    The acts of any Defendant acting individually were done with the knowledge, consent, approval and ratification of the other Defendants and are thereby attributed to the Defendants individually, jointly and severally.

107.    Biltres Staffing, Otto Biltres and Constandina Biltres are separate, culpable parties who benefitted individually and collectively, either directly or indirectly, from the pattern of racketeering activity over a period of more than three years.

108.    Each and every act of the Defendants was motivated by evil intent, or reckless or callous indifference to the rights of TemPay. Each of the Defendants was in some manner

19

proximately responsible for the events alleged in this Amended Verified Complaint and for TemPay's injuries and damages.

WHEREFORE, TemPay prays that this Court enter judgment in its favor and against Biltres Staffing and the Biltres Defendants and also provide the following relief:

a.    order that any proceeds derived from the fraudulent activity be disgorged and returned to TemPay; and

b.    award TemPay its attorneys' fees and costs of investigation and litigation; and, award any other relief the Court deems just and proper.

/s/ Stephanie S. Leuthauser
CHARLES M. HARRIS
Florida Bar No. 967459
cmharris@trenam.com
STEPHANIE S. LEUTHAUSER
Florida Bar No. 0044981
sleuthauser@trenam.com
TRENAM, KEMKER, SCHARF, BARKIN,
  FRYE, O'NEILL & MULLIS, P.A.
Bank of America Plaza, Suite 2700
101 E. Kennedy Boulevard
Tampa, Florida  33602
(813) 223-7474  /  (813) 229-6553 (facsimile)
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing **Plaintiff's Amended Verified Complaint for Injunctive Relief and Damages** has been electronically filed on March 5, 2012 with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing and copy to the parties and counsel of record.

/s/ Stephanie S. Leuthauser
Attorney

## **VERIFICATION**

I understand that I am swearing or affirming under oath to the truthfulness of the above

facts set forth in this Amended Verified Complaint for Injunctive Relief and Damages and that

the punishment for knowingly making a false statement includes fines and/or imprisonment.

2-22-12
_____
Date

_____
Larry Holstein
President, TemPay Inc.

STATE OF OHIO

COUNTY OF CUYAHOGA

Before me, personally appeared Larry Holstein, who produced _Drivers License_
as identification, and who, after being duly sworn, affirmed that the facts contained herein are
true and correct to the best of his knowledge and belief.

SWORN TO AND SUBSCRIBED TO ME on this _22nd_ day of February, 2012.

_____ Jason Kugler _____
Notary Public

Jason Kugler
Notary Public
State of Ohio
My Commission expires on the 26th day of May, 2014

**EXHIBIT A**

<u>MASTER FACTORING AGREEMENT</u>

**THIS MASTER FACTORING AGREEMENT** (this "Agreement") dated as of March 27, 2008, is made by and between Biltres Staffing of Tampa Bay, LLC a Florida Limited Liability Company ("Seller") whose mailing address is 11928 Sheldon Road, Suite 102, Tampa, FL 33626 and **TEMPAY INC**, an Ohio corporation ("Purchaser") whose mailing address 20600 Chagrin Blvd Ste 503, Cleveland, Ohio 44122.

PRELIMINARY STATEMENTS:

A.    Seller is in the business of providing temporary help services to other businesses.

B.    Seller desires to sell, and Purchaser desires to purchase, certain accounts receivable of Seller.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, Purchaser and Seller agree as follows:

1.    **DEFINITIONS**

As used in this Agreement, the words and terms listed below will have the following meanings (words and terms that are defined in the plural will include the singular):

"Accounts" means the accounts receivable of Seller, and any rights to payment for services rendered by Seller, in connection with or arising from the conduct of the Business, including all proceeds thereof.

"Assigned Accounts" means the Accounts purchased by Purchaser pursuant to an Assignment and subject to the provisions of this Agreement.

"Assignment" means an Assignment of an Account by Seller to Purchaser in the form attached hereto as Annex I.

"Business" means the temporary help service business operated by Seller.

"Collateral" has the meaning given to such term in Section 5.1 of this Agreement.

"Customers" means clients or customers of the Business who engage the services of temporary help employees furnished by Seller.

"Delinquent Account" means any Account that: (i) has been unpaid for more than ninety (90) days from its billing date; (ii) is owed by any Customer that is subject to any Insolvency Action; or (iii) is owed by a Customer as to which Purchaser has a reasonable basis for believing is about to become subject to an Insolvency Action.

"Direct Payroll Costs" means the employer's share of federal social security and Medicare taxes, federal and state unemployment taxes and any other direct or indirect taxes, not including workers' compensation insurance premiums or sales taxes, that are based on wages, sales or receipts that may be levied and that are the responsibility of an employer or provider of temporary employment services to collect and/or remit.

"Event of Termination" has the meaning given to such term in Section 11.1 of this Agreement.

"Finance Company" means a bank or financing company.

"Initial Advance" means the amount initially advanced by Purchaser to Seller for the assignment of an Account, as set forth on an Assignment, which shall be eighty-five percent (85%) of Invoice Amount.

"Insolvency Action" means, with respect to any person, (i) the inability or admission that it is unable to make timely payment on its debts, obligations or liabilities as they become due, (ii) the voluntary seeking of the appointment of, or the involuntary appointment of, any receiver, trustee or similar officer, (iii) the making of an assignment for the benefit of creditors, (iv) being subject to an order for relief entered in any case commenced by it under the federal bankruptcy laws, as now or hereafter in effect, or in any proceeding under any federal or state bankruptcy, insolvency, reorganization, arrangement or similar law, or the commencement of such a proceeding against it on an involuntary basis, (v) insolvency, or (vi) the entry of any material judgment against that person.

"Late Account" means any Account that has been unpaid for more than one (1) day from its billing date.

"Minimum Billing" means five thousand dollars ($5,000.00) of Assigned Accounts during a single week.

"Potential Event of Termination" means an event or condition that, after notice or lapse of time, or both, would constitute an Event of Termination.

"Purchaser's Fee" means the amount of the fee to be paid by Seller to Purchaser for the assignment of an Account and the administration thereof by Purchaser, as set forth on the Assignment, which will be two and forty-nine one hundredths percent (2.49%) of the Invoice Amount.

"Receipts" means any payments or remittances of a Customer in respect of an Account, in any form whatsoever.

"Term" has the meaning given to such term in Section 10 of this Agreement.

"Trade Name" means the name under which Seller conducts its Business from time to time during the term of this Agreement. At the time of execution, Seller's Trade Name is Biltres Staffing of Tampa Bay, LLC.

"UCC" means the Uniform Commercial Code now or hereafter in effect of the State of Florida.

2.    PURCHASE AND SALE OF ACCOUNTS

2.1    <u>Purchase of Accounts</u>.  Throughout the Term, and subject to the terms of this Agreement, Seller shall offer to sell to Purchaser all of Seller's Accounts, and Purchaser, in its sole discretion, shall have the option to purchase from Seller any or all of the Accounts so offered. During the Term, Seller may not offer any Account for sale to another Person, unless that Account is first offered to Purchaser and Purchaser decides not to Purchase that Account. Each Account that Purchaser, in its sole discretion, elects to purchase from Seller shall be identified and transferred by an Assignment. Each Assignment shall be subject to the rights and obligations of Purchaser and Seller under this Agreement and shall constitute a sale, transfer and assignment of all Seller's right, title and interest in and to the Assigned Account described therein. The parties contemplate that the Accounts

purchased by Purchaser during the Term will exceed $5,000 in the aggregate, but Seller agrees that Purchaser has no obligation to purchase any Account; and Seller shall not assert any claim that Purchaser has any such obligation or liability to Seller for failure to purchase any Account.

2.2    Assignments.  In addition to describing the Assigned Account, each Assignment shall indicate the Initial Advance and Purchaser's Fee.  Upon execution of an Assignment by both parties, Purchaser shall pay the Initial Advance to Seller and shall be entitled to receive the Purchaser's Fee set forth therein.

2.3    Purchaser's Rights.  Purchaser will have the exclusive right to receive, retain and apply all Receipts in accordance with this Agreement.  Seller irrevocably and unconditionally authorizes Purchaser to receive, endorse and collect any and all Receipts.  Purchaser further has the unqualified right to control all matters relating to the collection, settlement, compromise or adjustment of Assigned Accounts, including the right to give notice to Customers to make payment directly to Purchaser or to its order, the right to bring all proceedings for collection in Purchaser's or Seller's name, and to exercise Seller's rights to stoppage in transit, replevin and reclamation.  Purchaser is entitled to settle, compromise or adjust all disputes or claims directly with Customers on such terms as Purchaser, in its sole discretion, may determine without affecting the liability of Seller under this Agreement.  In the event that Purchaser accepts payment of less than the full amount of any Assigned Account from any Customer, the amount of such reduction shall constitute Indebtedness which is immediately due and payable by Seller to Purchaser.  Purchaser expressly reserves the right to offset uncollected payment of any Account against all other Accounts.

2.4    Lock Box.  Seller acknowledges and agrees that Purchaser has established a lock box for Receipts. All invoices with respect to Accounts sent by the Seller to Customers shall show on the face thereof the following legend and Seller shall not change such legend or permit any Customers to deviate from the payment instructions therein:

This account receivable has been assigned to and is owned by or subject to a security interest of TemPay Inc and is payable only in United States Dollars.  All payments shall be made payable to Biltres Staffing of Tampa Bay, LLC and sent to TemPay Inc Post Office Box 72066 Cleveland, Ohio 44192.

If, notwithstanding such instructions, Seller receives any Receipt, Seller shall receive such Receipt in trust for Purchaser, and shall immediately deliver such Receipt to Purchaser in its original form duly endorsed in blank.  The provisions of this Section 2.4 are applicable even in the event that Purchaser has purchased some, but not all, of the Accounts due from a Customer.  In the event of such a partial purchase, Purchaser shall be entitled to all payments received from that Customer, whether paid by that Customer to Purchaser or to Seller, until all amounts due to Purchaser for the Assigned Accounts due from such Customer have been paid to Purchaser.

2.5    Reserve Account.

(a)    In order to protect Purchaser's rights under this Agreement, Purchaser shall create as a matter of record keeping a reserve account (the "Reserve").  The Reserve shall be an amount equal to the total of the outstanding invoice amounts for all Assigned Accounts, reduced by the sum of: (i) the Initial Advances; (ii) all payments to Seller made pursuant to this Section 2.5; and (iii) all amounts applied by Purchaser to the payment or satisfaction of any of Seller's obligations under this Agreement, including the Purchaser's Fees and any amounts for which Purchaser is entitled pursuant to Section 8.1 of this Agreement.  On Friday of each week during the Term, Purchaser shall remit to Seller that portion of the Reserve representing the proceeds of Assigned Accounts that have been paid in full by Customers to Purchaser during the preceding week.

(b)    In addition to any other right or remedy provided for in this Agreement, Purchaser shall have the right to charge against the Reserve: (i) the full amount Purchaser has advanced, including any fees and costs, with respect to any Assigned Account that has become a Delinquent Account; and (ii) any amounts due to Purchaser pursuant to Section 2.3 of this Agreement.  In the event that for whatever reason the balance in the Reserve is insufficient to pay to or reimburse Purchaser for the full amount then owed by Seller and permitted to be charged against the Reserve, the balance shall constitute Indebtedness which is immediately due and payable by Seller to Purchaser.  Any such indebtedness shall bear interest at the rate of one and one half percent (1.5%) per month until paid.  The charging of any disputed Assigned Account against the Reserve shall not be deemed a reassignment thereof but shall merely constitute a bookkeeping entry, and title to such Assigned Account shall remain with Purchaser as security for any obligations of Seller due or to become due under this Agreement.

2.6    Late Accounts.  Seller shall pay to Purchaser a late payment fee in an amount equal to one thirtieth of one percent (approximately 0.0333333%) per day in respect of each Late Account for each day that an Assigned Account is a Late Account.

2.7    Delinquent Accounts.  Notwithstanding any provision in this Agreement to the contrary, the full amount of each Delinquent Account will be deducted from any amounts to be paid by Purchaser to Seller (including Initial Advances to be paid in connection with any future Assigned Accounts), on the ninety first (91st) day after the billing date or, at Purchaser's election, paid by Seller to Purchaser upon demand.  Payment received by Purchaser in the form of a check will be deemed to have been made when the funds represented thereby are available to Purchaser.  Notwithstanding any provision herein to the contrary, Seller agrees to pay to Purchaser an amount equal to any unpaid Assigned Account that has become a Delinquent Account.

3.    DUTIES OF SELLER

3.1    Operation of the Business.  Seller agrees to operate the Business in accordance with this Agreement and in full compliance with all applicable federal, state and local laws, rules and regulations.  Seller further agrees to promptly provide to Purchaser from time to time proof of payment of all Direct Payroll Costs.

3.2    Credit Information.  Seller agrees to develop and maintain sufficient credit information concerning all Customers and any prospective Customers and to provide that credit information to Purchaser on a timely basis so that Purchaser may make an effective evaluation of Customers, prospective Customers and Assigned Accounts.

3.3    Customers.  Seller will not change any of the terms of any Assigned Account without Purchaser's prior written consent.

2

3.4   Billing Information.   Seller agrees to maintain all payroll and billing information related to the Assigned Accounts as Purchaser may reasonably request from time to time, all on forms approved in writing by Purchaser.

3.5   Legal Cooperation.   Seller agrees to forward promptly to Purchaser, or to such persons as Purchaser may otherwise direct, copies of each and every summons, court order, garnishment, subpoena, process or notice of order for appearance in any suit or proceeding in which Purchaser or Seller may be involved.   Seller further agrees to cooperate with Purchaser's attorneys and insurance carriers in the defense of any suit or proceeding in which Purchaser or Seller may be involved.

3.6   Workers' Compensation Insurance.   Seller agrees, at its expense, to report and pay in a timely manner to the appropriate agencies all workers' compensation premiums.   Throughout the Term, Seller will furnish Purchaser with current certificates of insurance from the appropriate insurers certifying that Workers' Compensation Insurance has been issued in the amounts required by law covering the employees of Seller.

3.7   Fidelity Bond.   Seller agrees, at its own cost, to maintain for the benefit of Seller in the conduct of the Business throughout the Term, a third-party fidelity bond with respect to Seller's permanent employees in the amount of at least $100,000, subject to a deductible of no more than $5,000 per occurrence.   The limit described is a minimum amount that does not reflect a recommendation by Purchaser as to the amount of insurance coverage to be maintained by Seller.   Purchaser recommends that Seller maintain such additional insurance coverage in such amounts and types as may be customary in the temporary help services business.   Without cost to Purchaser, such policy of insurance will name Purchaser as an additional insured and will include a provision that such policy may not be terminated or materially amended except after 30 days' prior written notice to Purchaser.   Within 10 days of Purchaser's written request, Seller will provide Purchaser with certificates of all such insurance policies.

3.8   Exclusive Agreement.   Seller agrees during the Term to sell its Accounts on an exclusive basis to Purchaser.   Seller further agrees, during the term this Agreement and so long as any obligations remain outstanding, Seller will not obtain factoring or other financing for the Employee payroll and Accounts Receivable generated by its business from any other source, nor shall any affiliated person or entity obtain such factoring or financing.

4.   REPRESENTATIONS AND WARRANTIES OF SELLER

4.1   Authority of Seller.   Seller is a Corporation duly organized, validly existing and in good standing in the State of Florida. Seller has all power and authority to carry on the Business and to execute and deliver this Agreement and to perform the transactions contemplated by this Agreement, all of which have been duly authorized by all necessary and proper corporate, company, or other similar actions.

4.2   Location of Chief Executive Office and Assigned Accounts.   The sole place of business, or if it has more than one place of business, the chief place of business and chief executive office, of Seller and the office where Seller keeps its records concerning the Assigned Accounts is located at 11928 Sheldon Road, Suite 102, Tampa, FL 33626.   The tangible personal property of Seller that constitutes a portion of the Collateral is located at 11928 Sheldon Road, Suite 102, Tampa, FL 33626.

4.3   Trade Names.   Seller conducts its Business under the Trade Name.   Seller does not own any other trade name and is not licensed to use any other trade name except the following: Biltres Staffing of Tampa Bay, LLC.   Seller has not used any other trade name within the last five years, except as set forth on Exhibit A attached hereto.

4.4   Binding Effect of Documents.   This Agreement is the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.5   No Violation of Agreements.   The execution and delivery of this Agreement by Seller does not violate any agreement or instrument to which Seller is a party.

4.6   Ownership of Assigned Accounts.   Seller is the legal and beneficial owner of each Assigned Account and the other Collateral free and clear of any lien, security interest, pledge, option, restriction or other encumbrance except the security interests created by or pursuant to this Agreement. No financing statement or other instrument similar in effect covering all or any part of any Assigned Account or the other Collateral is on file in any recording office, except such as may have been filed in connection with this Agreement.   All work relating to any Assigned Account has been completed in a good, workmanlike manner and no Customer has any right to reject the services covered by such Assigned Account.

4.7   Authority to Assign Assigned Accounts.   There are no express or implied conditions precedent to the collection of any Assigned Account.   All documents relating to Assigned Accounts are genuine and constitute the legally valid and binding obligations of the parties thereto. Seller has remitted any and all excise and sales taxes imposed with respect to the sales giving rise to such Assigned Account to the appropriate governmental or regulatory authority.   All Assigned Accounts will be paid in accordance with their respective terms.

4.8   Valid and Perfected First Priority Security Interest.   This Agreement, together with the filing of financing statements under the UCC, creates a valid and perfected security interest in the Assigned Accounts and the other Collateral.

4.9   Business Purpose.   The funds paid to the Seller will be used solely for the Seller's business purposes and not for personal, family or household purposes.

4.10   Full Disclosure.   Seller has provided all information requested in writing by Purchaser, and all such information is complete and accurate in all material respects.   None of the written information, exhibits or reports furnished by Seller omit to state any fact necessary to make the statements contained therein not misleading.

5.   GRANT OF SECURITY INTEREST

5.1   Pledge, Assignment and Grant of Security Interest.   Seller pledges and assigns to Purchaser, and grants to Purchaser a continuing security interest in, all Seller's right, title and interest in and to the Collateral, whether now or hereafter existing and wherever located, to secure the payments due to Purchaser under this Agreement and the performance and observance by Seller of all its obligations under this Agreement.   As used in this Agreement, Collateral means: (a) the Assigned Accounts and all other Accounts; (b) equipment and inventory (including materials and supplies) of any kind whatsoever; (c) general intangibles, books, records and other documents relating to the inventory, accounts and equipment; (d) deposit accounts, notes, certificates of deposit, deposit accounts, checks and other instruments; and (e) all cash and non-cash proceeds of (a) through (d) above and, to the extent not otherwise included, all payments under insurance (whether or not Purchaser is the loss payee thereof), or any indemnity, warranty or guaranty,

payable by reason of loss or damage to or otherwise with respect to any of the foregoing, in each case, howsoever Seller's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

5.2     Financing Statements. Seller consents to the signing and filing by Purchaser, without a signature on behalf of Seller, or to the signing thereof by Purchaser on behalf of Seller, of all UCC financing statements or other forms deemed necessary or appropriate by Purchaser, in its sole discretion, in order to perfect, continue and protect the security interest granted by Seller to Purchaser under this Agreement.

5.3     Cooperation. Seller agrees that in the event Purchaser elects to pledge such Assigned Accounts and/or any other Collateral as security for a loan or loans extended to Purchaser by a Finance Company, Seller, at its expense, will cooperate fully with Purchaser and execute any and all requested documents that may be reasonably required by either Purchaser or the Finance Company to effectuate such financing arrangements, including security agreements and UCC filings. Seller further agrees, at its expense, that it will promptly take all further action that may be reasonably necessary or desirable, or that Purchaser may reasonably request, in order to perfect and protect the security interest granted or purported to be granted by this Agreement to enable Purchaser to exercise and enforce its rights and remedies with respect to any of the Collateral.

6.      CONFIDENTIALITY

6.1     Confidentiality. Seller agrees that the terms, the Purchaser's business methods and trade secrets, and any and all other records and information clearly and specifically identified by Purchaser as confidential will be held by Seller in strict confidence and treated as the confidential property of Purchaser. Seller will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose any of the foregoing to any Person, unless specifically authorized to do so in writing by Purchaser or unless required by law. Purchaser agrees that any and all records and information clearly and specifically identified by Seller as confidential will be held by Purchaser in strict confidence and treated as the confidential property of Seller. Purchaser will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose the records and information of Seller to any Person, unless specifically authorized to do so in writing by Seller or unless required by law.

7.      FURTHER ASSURANCES

7.1     Change of Name. In the event that Seller changes its present name or Trade Name, or acquires an additional Trade Name other than those set forth in this Agreement, Seller must give written notice of any such name change to Purchaser within 10 days.

7.2     Change of Chief Executive Office. In the event that Seller changes its place of business or its chief place of business or chief executive office, as the case may be, to a place other than that set forth in Section 4.2, Seller must give written notice of any such change to Purchaser within 10 days.

7.3     Maintenance of Books. Seller must keep at its chief executive office for a period of five years all payroll and personnel records and all other books of account and business records customary for the industry, which books and records are subject to inspection by Purchaser and its agents and representatives during normal business hours.

8.      INDEMNIFICATION

8.1     Indemnity. Seller agrees to indemnify Purchaser against and save Purchaser harmless from any and all manner of suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Seller to perform or observe its obligations under this Agreement.

8.2     Independent Contractor. It is understood and agreed that each party hereto is an independent contractor with respect to the other. Nothing in this Agreement will be construed to constitute either party as the employee, representative or, except to the extent expressly provided herein, the agent of the other, or to constitute Purchaser and Seller as partners or joint ventures. Seller will not have the power, and will not represent or imply that it has the power, to obligate Purchaser for any expenses, except as otherwise expressly agreed to in writing by Purchaser.

9.      ASSIGNABILITY

9.1     Assignment. This Agreement is personal to Seller and is not assignable or transferable by Seller, in whole or in part, either voluntarily or by operation of law, except with the prior written consent of Purchaser. Any attempted assignment or transfer by Seller without the prior written consent of Purchaser will be void and unenforceable. For all purposes of this Agreement, the transfer of a majority of the equity ownership of Seller, in one or more transactions, to any persons other than the present owners of Seller will be deemed an assignment of this Agreement. This Agreement is binding upon and inures to the benefit of Purchaser and Seller, and their respective permitted successors and assigns.

10.     TERM OF AGREEMENT

10.1    This Agreement is effective as of the date hereof and will continue in effect for twelve (12) months from the date hereof and will automatically be renewed for successive twelve (12) month periods (the "Term") unless either party gives the other party written notice of termination at least one hundred and twenty (120) days but no sooner than sixty (60) days before the end of the then current term, or until sooner terminated or modified by the parties in accordance with the terms and conditions of this Agreement. No termination, expiration or modification of this Agreement will affect rights accrued under this Agreement prior to the date of such termination, expiration or modification.

11.     EVENT OF TERMINATION

11.1    Event of Termination. Each of the following will constitute an Event of Termination under this Agreement:

(a)     If any representation, warranty or statement made in this Agreement by Seller is false or erroneous in any respect when made.

(b)     If Seller fails to observe or perform any of its obligations under this Agreement, or if the Term expires.

(c)     The suspension by Seller of the operation of the Business, or if Seller is subject to any Insolvency Action, or entry of any material lien against Seller.

(d)     If Seller sells an Account to an entity other than Purchaser during the Term without the prior written consent of Purchaser.

(e)     The uninsured loss, theft, damage or destruction, or encumbrance of any of the Collateral.

4

(f)     If there occurs a material adverse change in the business, assets or financial condition of Seller or if Purchaser deems itself insecure.

(g)     If during any consecutive 4 week period commencing 6 months after the date hereof, Seller's average weekly Assigned Accounts do not equal or exceed Minimum Billings, Purchaser may terminate this Agreement, such termination to be effective 60 days after Purchaser gives written notice of its election to terminate.

11.2     Remedies on Event of Termination.   If an Event of Termination has occurred, to the extent permitted by applicable law and in addition to any other right or remedy provided for in this Agreement:

(a)     Purchaser may suspend its performance under this Agreement, and may set off against any obligation due Seller an amount equal to any and all obligations of Seller owed to Purchaser, whether matured, unmatured or contingent.

(b)     Purchaser may immediately accelerate all obligations of Seller owing to Purchaser.

(c)     Purchaser may take any actions Purchaser deems reasonably necessary to collect the Assigned Accounts.

(d)     Purchaser may exercise in respect of the Collateral, in addition to other rights and remedies provided for in this Agreement or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) and under any other applicable personal property security legislation, and also may (i) require Seller to, and Seller hereby agrees that it will at its expense and upon request of Purchaser, assemble all or part of the Collateral as directed by Purchaser and make it available to Purchaser at a place to be designated by Purchaser which is reasonably convenient to both parties and (ii) without notice, except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Purchaser's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Purchaser may deem commercially reasonable.  Seller agrees that, to the extent notice of sale is required by law, at least 10 days' notice to Seller of the time and place of any public sale or the time after which any private sale is to be made constitutes reasonable notification.  Purchaser is not obligated to make any sale of Collateral regardless of notice of sale having been given.  Purchaser may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(e)     Purchaser may terminate this Agreement, or otherwise suspend its performance of this Agreement.

(f)     Purchaser may exercise any and all other legal and equitable rights available to Purchaser.

All of the foregoing rights and remedies are cumulative and not exclusive and, to the extent permitted by law, are in addition to any other rights or remedies provided by law.

11.3     Remedies on Potential Event of Termination.   If a Potential Event of Termination has occurred, Purchaser may suspend its performance under this Agreement.

12.0     Miscellaneous.

12.1     Purchaser Appointed Attorney-In-Fact.   Seller hereby irrevocably appoints Purchaser as Seller's attorney-in-fact, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time in Purchaser's discretion, to take any action and to execute any instrument which Purchaser may deem necessary or advisable to accomplish the purposes of this Agreement including:

(a)     to sign, in the name and on behalf of Seller, any such documents that Purchaser may reasonably deem necessary or desirable to pledge and collect the Assigned Accounts and other Collateral;

(b)     to verify with Customers all Assigned Accounts;

(c)     to send requests to Customers pursuant to which Customers acknowledge Assigned Accounts and confirm that such Customer has no claims, defenses, offsets or counterclaims with respect to such Assigned Account;

(d)     to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Assigned Accounts and the other Collateral;

(e)     to receive, endorse, and collect any drafts or other instruments, documents and chattel paper; and

(f)     after the occurrence of an Event of Termination, to file any claims or take any action or institute any proceedings which Purchaser may deem necessary or desirable for the collection of any of the Collateral or the rights of Purchaser with respect to any of the Collateral.

12.2     Notices.   All notices, requests, demands and other communications provided for hereunder must be in writing and must be given solely:  (a) by hand delivery or by overnight courier delivery service, with all charges paid, (b) by facsimile transmission, if confirmed same day in writing by first-class mail sent, or (c) by registered or certified mail, postage prepaid and addressed to the parties.  For the purposes of this Agreement, such notices will be deemed to be given and received:  (a) if by hand or by overnight courier service, upon actual receipt, (b) if by facsimile transmission, upon receipt of machine-generated confirmation of such transmission (and provided the above-stated written confirmation is sent), or (c) if by registered or certified mail, upon the first to occur of actual receipt or the expiration of 48 hours after deposit with the U.S. Postal Service.  Notices or other communications hereunder will be addressed to a party at the addresses specified in the preamble of this Agreement, or to such other address as may be furnished in writing by a party to the other party.

12.3     Severability.   If any term or provision of this Agreement is found invalid or unenforceable, such invalidity or unenforceability will not affect the remaining provisions of this Agreement, which will remain in full force and effect as though such invalid or unenforceable provisions had not been contained in this Agreement.

12.4     Entire Agreement.   This Agreement, including the documents referenced herein, contains the entire Agreement between Purchaser and Seller; and there are no representations, inducements, arrangements, promises or agreements outstanding between them, either oral or in writing, other than those contained in this Agreement.

5

12.5   <u>Arbitration, Jurisdiction and Venue.</u>     At Purchaser's sole discretion, Purchaser shall have the right to have any dispute or disagreement between the parties arising out of or relating to this Agreement, or the transactions or relationships contemplated hereby, resolved by arbitration under the commercial arbitration rules then obtaining of the American Arbitration Association, by a single arbitrator, selected by Purchaser, which arbitration shall be conducted in Cuyahoga County, Ohio, where Purchaser has its principal offices and where Purchaser has accepted this Agreement and will perform its obligations hereunder.  The AAA arbitrator's decision shall be final and binding, and any court of competent jurisdiction may enter judgment upon the award in accordance with applicable law.  The parties acknowledge and agree that resolution of any disputes or disagreements by arbitration is at the sole and exclusive option of Purchaser.

Seller further submits to the jurisdiction of the Courts of the State of Ohio, with venue at the Cuyahoga County Court of Common Pleas, Cuyahoga County, Ohio.  In the event of removal to a Federal Court, such court shall be the District Court for the Northern District of Ohio, Eastern Division. Seller expressly waives the jurisdiction of any other court, and acknowledges and agrees that this Agreement, without more, shall be sufficient to sustain the dismissal of an action commenced by Seller in any court other than specified in this Agreement.

12.6   <u>Governing Law.</u>  This Agreement will be governed by, construed and enforced in accordance with, the laws of the State of Ohio, without reference to any conflicts of law principles.

12.7   <u>Failure to Perform.</u>  Purchaser will not be liable or responsible in any manner to Seller for Purchaser's failure to perform or delay in performance of the terms of this Agreement when such failure or delay is due to either the direct or indirect result of strikes or other labor troubles, fires, flood, material or labor shortages, equipment failure, postal mailing delay, embargoes, stoppages in transit, acts, regulations, or order of governments, war, sabotage, civil insurrection, acts of God or the public enemy, or any other causes beyond the reasonable control of Purchaser.

12.8   <u>Maximum Interest Rate.</u>  Seller and Purchaser intend to comply with all applicable laws in effect from time to time limiting the maximum rate of interest that may be charged or collected.  Accordingly, notwithstanding any other provision hereof, Seller shall not be required to make any payment to or for the account of the Purchaser to the extent that such requirement would violate or conflict with nonwaivable provisions of applicable laws limiting the maximum amount of interest which may be charged or collected, and any payment so made by Seller shall be applied to amounts determined to be principal.

12.9   <u>Disclaimer of Liability.</u>  IN NO EVENT WILL PURCHASER BE LIABLE TO SELLER FOR ANY LOST PROFITS, LOST SAVINGS OR OTHER CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES RESULTING FROM OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS OR RELATIONSHIPS CONTEMPLATED HEREBY OR PURCHASER'S PERFORMANCE OR FAILURE TO PERFORM HEREUNDER, EVEN IF PURCHASER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

6

**SELLER:**

By: _____

Its: _President_

Date: _2/22/2008_

**PURCHASER:**

Accepted In Cuyahoga County, Ohio
This 5TH day of MARCH , 2008

**TEMPAY INC**

By: _____
        Larry Holstein
Its:    President

Notary Acknowledgement for Staffing Service:

STATE OF _Florida_ )

COUNTY OF _Hillsborough_ )

I, _Richelle Spain_, a Notary Public for said County
and State, certify that _Otto Bittres_ personally
came before me this day and acknowledged that he (or she)
is _President_ of _Bittres Staffing_ a
corporation, and that by authority duly given and as the
act of the corporation the instrument was signed in
its name by him (or her)
Witness my hand and official seal, this _22_ day of
_February_ , 20 08

(Official Seal)


Notary Public

My commission expired: _may 23_ , 20 11

RICHELLE SPAIN
MY COMMISSION # DD 677633
EXPIRES: May 23, 2011
Bonded Thru Notary Public Underwriters

## GUARANTY

In order to induce Purchaser to execute and perform the foregoing Agreement, the undersigned, each a party representing himself or herself as having an economic interest in Seller, hereby personally, absolutely and unconditionally, jointly and severally, guarantee to Purchaser the full and timely payment, and performance and observance, by Seller of its obligations under this Agreement. This Guaranty is a guaranty of performance and payment and not of collection, and each of the undersigned understands that Purchaser may proceed to enforce its rights hereunder against the undersigned or any of them, without being obligated to first or concurrently proceed against Seller under the foregoing Agreement, or any other of the undersigned, under this Guaranty.

Individually and Personally

Print name _Otto S. Bittner Jr._

Address _10408 White Lake Court_
_Tampa, Fl. 33626_

Individually and Personally

Print name _Constandina Murges_

Address _10408 White Lake Court_
_Tampa, Fl 33626_

**EXHIBIT B**



## MASTER FACTORING AGREEMENT

**THIS MASTER FACTORING AGREEMENT** (this "Agreement") dated as of April 20, 2011, is made by and between Biltres Staffing of Tampa Bay, LLC a Florida Limited Liability Company ("Seller") whose mailing address is 11928 Sheldon Road, Suite 102, Tampa, FL 33626 and TEMPAY INC, an Ohio corporation ("Purchaser") whose mailing address 20600 Chagrin Blvd Ste 503, Cleveland, Ohio 44122.

### PRELIMINARY STATEMENTS:

A.    Seller is in the business of providing temporary help services to other businesses.
B.    Seller desires to sell, and Purchaser desires to purchase, certain accounts receivable of Seller.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, Purchaser and Seller agree as follows:

1.    DEFINITIONS
      As used in this Agreement, the words and terms listed below will have the following meanings (words and terms that are defined in the plural will include the singular):

"Accounts" means the accounts receivable of Seller, and any rights to payment for services rendered by Seller, in connection with or arising from the conduct of the Business, including all proceeds thereof.

"Assigned Accounts" means the Accounts purchased by Purchaser pursuant to an Assignment and subject to the provisions of this Agreement.

"Assignment" means an Assignment of an Account by Seller to Purchaser in the form attached hereto as Annex I.

"Business" means the temporary help service business operated by Seller.

"Collateral" has the meaning given to such term in Section 5.1 of this Agreement.

"Customers" means clients or customers of the Business who engage the services of temporary help employees furnished by Seller.

"Delinquent Account" means any Account that: (i) has been unpaid for more than ninety (90) days from its billing date; (ii) is owed by any Customer that is subject to any Insolvency Action; or (iii) is owed by a Customer as to which Purchaser has a reasonable basis for believing is about to become subject to an Insolvency Action.

"Direct Payroll Costs" means the employer's share of federal social security and Medicare taxes, federal and state unemployment taxes and any other direct or indirect taxes, not including workers' compensation insurance premiums or sales taxes, that are based on wages, sales or receipts that may be levied and that are the responsibility of an employer or provider of temporary employment services to collect and/or remit.

"Event of Termination" has the meaning given to such term in Section 11.1 of this Agreement.

"Finance Company" means a bank or financing company.

"Initial Advance" means the amount initially advanced by Purchaser to Seller for the assignment of an Account, as set forth on an Assignment, which shall be eighty-five percent (85%) of Invoice Amount.

"Insolvency Action" means, with respect to any person, (i) the inability or admission that it is unable to make timely payment on its debts, obligations or liabilities as they become due, (ii) the voluntary seeking of the appointment of, or the involuntary appointment of, any receiver, trustee or similar officer, (iii) the making of an assignment for the benefit of creditors, (iv) being subject to an order for relief entered in any case commenced by it under the federal bankruptcy laws, as now or hereafter in effect, or in any proceeding under any federal or state bankruptcy, insolvency, reorganization, arrangement or similar law, or the commencement of such a proceeding against it on an involuntary basis, (v) insolvency, or (vi) the entry of any material judgment against that person.

"Late Account" means any Account that has been unpaid for more than one (1) day from its billing date.

"Minimum Billing" means five thousand dollars ($5,000.00) of Assigned Accounts during a single week.

"Potential Event of Termination" means an event or condition that, after notice or lapse of time, or both, would constitute an Event of Termination.

"Purchaser's Fee" means the amount of the fee to be paid by Seller to Purchaser for the assignment of an Account and the administration thereof by Purchaser, as set forth on the Assignment, which will be one and ninety-nine one hundredths percent (1.99%) of the Invoice Amount.

"Receipts" means any payments or remittances of a Customer in respect of an Account, in any form whatsoever.

"Term" has the meaning given to such term in Section 10 of this Agreement.

"Trade Name" means the name under which Seller conducts its Business from time to time during the term of this Agreement. At the time of execution, Seller's Trade Name is Biltres Staffing of Tampa Bay, LLC.

"UCC" means the Uniform Commercial Code now or hereafter in effect of the State of Florida.

2.    PURCHASE AND SALE OF ACCOUNTS
      2.1    <u>Purchase of Accounts</u>.   Throughout the Term, and subject to the terms of this Agreement, Seller shall offer to sell to Purchaser all of Seller's Accounts, and Purchaser, in its sole discretion, shall have the option to purchase from Seller any or all of the Accounts so offered. During the Term, Seller may not offer any Account for sale to another Person, unless that Account is first offered to Purchaser and Purchaser decides not to Purchase that Account. Each Account that Purchaser, in its sole discretion, elects to purchase from Seller shall be identified and transferred by an Assignment. Each Assignment shall be subject to the rights and obligations of Purchaser and Seller under this Agreement and shall constitute a sale, transfer and assignment of all Seller's right, title and interest in and to the Assigned Account described therein. The parties contemplate that the Accounts

purchased by Purchaser during the Term will exceed $5,000 in the aggregate, but Seller agrees that Purchaser has no obligation to purchase any Account; and Seller shall not assert any claim that Purchaser has any such obligation or liability to Seller for failure to purchase any Account.

2.2 **Assignments.** In addition to describing the Assigned Account, each Assignment shall indicate the Initial Advance and Purchaser's Fee. Upon execution of an Assignment by both parties, Purchaser shall pay the Initial Advance to Seller and shall be entitled to receive the Purchaser's Fee set forth therein.

2.3 **Purchaser's Rights.** Purchaser will have the exclusive right to receive, retain and apply all Receipts in accordance with this Agreement. Seller irrevocably and unconditionally authorizes Purchaser to receive, endorse and collect any and all Receipts. Purchaser further has the unqualified right to control all matters relating to the collection, settlement, compromise or adjustment of Assigned Accounts, including the right to give notice to Customers to make payment directly to Purchaser or to its order, the right to bring all proceedings for collection in Purchaser's or Seller's name, and to exercise Seller's rights to stoppage in transit, replevin and reclamation. Purchaser is entitled to settle, compromise or adjust all disputes or claims directly with Customers on such terms as Purchaser, in its sole discretion, may determine without affecting the liability of Seller under this Agreement. In the event that Purchaser accepts payment of less than the full amount of any Assigned Account from any Customer, the amount of such reduction shall constitute indebtedness which is immediately due and payable by Seller to Purchaser. Purchaser expressly reserves the right to offset uncollected payment of any Account against all other Accounts.

2.4 **Lock Box.** Seller acknowledges and agrees that Purchaser has established a lock box for Receipts. All invoices with respect to Accounts sent by the Seller to Customers shall show on the face thereof the following legend and Seller shall not change such legend or permit any Customers to deviate from the payment instructions therein:

> This account receivable has been assigned to and is owned by or subject to a security interest of TemPay Inc and is payable only in United States Dollars. All payments shall be made payable to Biltres Staffing of Tampa Bay, LLC and sent to TemPay, Inc. JAF Station, Post Office Box 3249, New York, NY 10116-3249.

If, notwithstanding such instructions, Seller receives any Receipt, Seller shall receive such Receipt in trust for Purchaser, and shall immediately deliver such Receipt to Purchaser in its original form duly endorsed in blank. The provisions of this Section 2.4 are applicable even in the event that Purchaser has purchased some, but not all, of the Accounts due from a Customer. In the event of such a partial purchase, Purchaser shall be entitled to all payments received from that Customer, whether paid by that Customer to Purchaser or to Seller, until all amounts due to Purchaser for the Assigned Accounts due from such Customer have been paid to Purchaser.

2.5 **Reserve Account.**

(a) In order to protect Purchaser's rights under this Agreement, Purchaser shall create as a matter of record keeping a reserve account (the "Reserve"). The Reserve shall be an amount equal to the total of the outstanding invoice amounts for all Assigned Accounts, reduced by the sum of: (i) the Initial Advances; (ii) all payments to Seller made pursuant to this Section 2.5; and (iii) all amounts applied by Purchaser to the payment or satisfaction of any of Seller's obligations under this Agreement, including the Purchaser's Fees and any amounts for which Purchaser is entitled pursuant to Section 8.1 of this Agreement. On Friday of each week during the Term, Purchaser shall remit to Seller that portion of the Reserve representing the proceeds of Assigned Accounts that have been paid in full by Customers to Purchaser during the preceding week.

(b) In addition to any other right or remedy provided for in this Agreement, Purchaser shall have the right to charge against the Reserve: (i) the full amount Purchaser has advanced, including any fees and costs, with respect to any Assigned Account that has become a Delinquent Account; and (ii) any amounts due Purchaser pursuant to Section 2.3 of this Agreement. In the event that for whatever reason the balance in the Reserve is insufficient to pay to or reimburse Purchaser for the full amount then owed by Seller and permitted to be charged against the Reserve, the balance shall constitute indebtedness which is immediately due and payable by Seller to Purchaser. Any such indebtedness shall bear interest at the rate of one and one half percent (1.5%) per month until paid. The charging of any disputed Assigned Account against the Reserve shall not be deemed a reassignment thereof but shall merely constitute a bookkeeping entry, and title to such Assigned Account shall remain with Purchaser as security for any obligations of Seller due or to become due under this Agreement.

2.6 **Late Accounts.** Seller shall pay to Purchaser a late payment fee in an amount equal to one thirtieth of one percent (approximately 0.0333333%) per day in respect of each Late Account for each day that an Assigned Account is a Late Account.

2.7 **Delinquent Accounts.** Notwithstanding any provision in this Agreement to the contrary, the full amount of each Delinquent Account will be deducted from any amounts to be paid by Purchaser to Seller (including Initial Advances to be paid in connection with any future Assigned Accounts), on the ninety first (91st) day after the billing date or, at Purchaser's election, paid by Seller to Purchaser upon demand. Payment received by Purchaser in the form of a check will be deemed to have been made when the funds represented thereby are available to Purchaser. Notwithstanding any provision herein to the contrary, Seller agrees to pay to Purchaser an amount equal to any unpaid Assigned Account that has become a Delinquent Account.

3. **DUTIES OF SELLER**

3.1 **Operation of the Business.** Seller agrees to operate the Business in accordance with this Agreement and in full compliance with all applicable federal, state and local laws, rules and regulations. Seller further agrees to promptly provide to Purchaser from time to time proof of payment of all Direct Payroll Costs.

3.2 **Credit Information.** Seller agrees to develop and maintain sufficient credit information concerning all Customers and any prospective Customers and to provide that credit information to Purchaser on a timely basis so that Purchaser may make an effective evaluation of Customers, prospective Customers and Assigned Accounts.

3.3 **Customers.** Seller will not change any of the terms of any Assigned Account without Purchaser's prior written consent.

2

3.4   Billing Information.   Seller agrees to maintain all payroll and billing information related to the Assigned Accounts as Purchaser may reasonably request from time to time, all on forms approved in writing by Purchaser.

3.5   Legal Cooperation.   Seller agrees to forward promptly to Purchaser, or to such persons as Purchaser may otherwise direct, copies of each and every summons, court order, garnishment, subpoena, process or notice of order for appearance in any suit or proceeding in which Purchaser or Seller may be involved.   Seller further agrees to cooperate with Purchaser's attorneys and insurance carriers in the defense of any suit or proceeding in which Purchaser or Seller may be involved.

3.6   Workers' Compensation Insurance.   Seller agrees, at its expense, to report and pay in a timely manner to the appropriate agencies all workers' compensation premiums.   Throughout the Term, Seller will furnish Purchaser with current certificates of insurance from the appropriate insurers certifying that Workers' Compensation Insurance has been issued in the amounts required by law covering the employees of Seller.

3.7   Fidelity Bond.   Seller agrees, at its own cost, to maintain for the benefit of Seller in the conduct of the Business throughout the Term, a third-party fidelity bond with respect to Seller's permanent employees in the amount of at least $100,000, subject to a deductible of no more than $5,000 per occurrence.   The limit described is a minimum amount that does not reflect a recommendation by Purchaser as to the amount of insurance coverage to be maintained by Seller.   Purchaser recommends that Seller maintain such additional insurance coverage in such amounts and types as may be customary in the temporary help services business.   Without cost to Purchaser, such policy of insurance will name Purchaser as an additional insured and will include a provision that such policy may not be terminated or materially amended except after 30 days' prior written notice to Purchaser.   Within 10 days of Purchaser's written request, Seller will provide Purchaser with certificates of all such insurance policies.

3.8   Exclusive Agreement.   Seller agrees during the Term to sell its Accounts on an exclusive basis to Purchaser.   Seller further agrees, during the term this Agreement and so long as any obligations remain outstanding, Seller will not obtain factoring or other financing for the Employee payroll and Accounts Receivable generated by its business from any other source, nor shall any affiliated person or entity obtain such factoring or financing.

4.   REPRESENTATIONS AND WARRANTIES OF SELLER

4.1   Authority of Seller.   Seller is a Corporation duly organized, validly existing and in good standing in the State of Florida. Seller has all power and authority to carry on the Business and to execute and deliver this Agreement and to perform the transactions contemplated by this Agreement, all of which have been duly authorized by all necessary and proper corporate, company, or other similar actions.

4.2   Location of Chief Executive Office and Assigned Accounts.   The sole place of business, or if it has more than one place of business, the chief place of business and chief executive office, of Seller and the office where Seller keeps its records concerning the Assigned Accounts is located at 11928 Sheldon Road, Suite 102, Tampa, FL 33626.   The tangible personal property of Seller that constitutes a portion of the Collateral is located at 11928 Sheldon Road, Suite 102, Tampa, FL  33626.

4.3   Trade Names.   Seller conducts its Business under the Trade Name.   Seller does not own any other trade name and is not licensed to use any other trade name except the following: Blitres Staffing of Tampa Bay, LLC.   Seller has not used any other trade name within the last five years, except as set forth on Exhibit A attached hereto.

4.4   Binding Effect of Documents.   This Agreement is the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.5   No Violation of Agreements.   The execution and delivery of this Agreement by Seller does not violate any agreement or instrument to which Seller is a party.

4.6   Ownership of Assigned Accounts.   Seller is the legal and beneficial owner of each Assigned Account and the other Collateral free and clear of any lien, security interest, pledge, option, restriction or other encumbrance except the security interests created by or pursuant to this Agreement.   No financing statement or other instrument similar in effect covering all or any part of any Assigned Account or the other Collateral is on file in any recording office, except such as may have been filed in connection with this Agreement.   All work relating to any Assigned Account has been completed in a good, workmanlike manner and no Customer has any right to reject the services covered by such Assigned Account.

4.7   Authority to Assign Assigned Accounts.   There are no express or implied conditions precedent to the collection of any Assigned Account.   All documents relating to Assigned Accounts are genuine and constitute the legally valid and binding obligations of the parties thereto. Seller has remitted any and all excise and sales taxes imposed with respect to the sales giving rise to such Assigned Account to the appropriate governmental or regulatory authority.   All Assigned Accounts will be paid in accordance with their respective terms.

4.8   Valid and Perfected First Priority Security Interest.   This Agreement, together with the filing of financing statements under the UCC, creates a valid and perfected security interest in the Assigned Accounts and the other Collateral.

4.9   Business Purpose.   The funds paid to the Seller will be used solely for the Seller's business purposes and not for personal, family or household purposes.

4.10   Full Disclosure.   Seller has provided all information requested in writing by Purchaser, and all such information is complete and accurate in all material respects.   None of the written information, exhibits or reports furnished by Seller omit to state any fact necessary to make the statements contained therein not misleading.

5.   GRANT OF SECURITY INTEREST

5.1   Pledge, Assignment and Grant of Security Interest.   Seller pledges and assigns to Purchaser, and grants to Purchaser a continuing security interest in, all Seller's right, title and interest in and to the Collateral, whether now or hereafter existing and wherever located, to secure the payments due to Purchaser under this Agreement and the performance and observance by Seller of all its obligations under this Agreement.   As used in this Agreement, Collateral means: (a) the Assigned Accounts and all other Accounts; (b) equipment and inventory (including materials and supplies) of any kind whatsoever; (c) general intangibles, books, records and other documents relating to the inventory, accounts and equipment; (d) deposit accounts, notes, certificates of deposit, deposit accounts, checks and other instruments; and (e) all cash and non-cash proceeds of (a) through (d) above and, to the extent not otherwise included, all payments under insurance (whether or not Purchaser is the loss payee thereof), or any indemnity, warranty or guaranty,

3

payable by reason of loss or damage to or otherwise with respect to any of the foregoing, in each case, howsoever Seller's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

      5.2     Financing Statements.  Seller consents to the signing and filing by Purchaser, without a signature on behalf of Seller, or to the signing thereof by Purchaser on behalf of Seller, of all UCC financing statements or other forms deemed necessary or appropriate by Purchaser, in its sole discretion, in order to perfect, continue and protect the security interest granted by Seller to Purchaser under this Agreement.

      5.3     Cooperation.  Seller agrees that in the event Purchaser elects to pledge such Assigned Accounts and/or any other Collateral as security for a loan or loans extended to Purchaser by a Finance Company, Seller, at its expense, will cooperate fully with Purchaser and execute any and all requested documents that may be reasonably required by either Purchaser or the Finance Company to effectuate such financing arrangements, including security agreements and UCC filings.  Seller further agrees, at its expense, that it will promptly take all further action that may be reasonably necessary or desirable, or that Purchaser may reasonably request, in order to perfect and protect the security interest granted or purported to be granted by this Agreement to enable Purchaser to exercise and enforce its rights and remedies with respect to any of the Collateral.

6.     CONFIDENTIALITY

      6.1     Confidentiality.  Seller agrees that the terms, the Purchaser's business methods and trade secrets, and any and all other records and information clearly and specifically identified by Purchaser as confidential will be held by Seller in strict confidence and treated as the confidential property of Purchaser.  Seller will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose any of the foregoing to any Person, unless specifically authorized to do so in writing by Purchaser or unless required by law.  Purchaser agrees that any and all records and information clearly and specifically identified by Seller as confidential will be held by Purchaser in strict confidence and treated as the confidential property of Seller.  Purchaser will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose the records and information of Seller to any Person, unless specifically authorized to do so in writing by Seller or unless required by law.

7.     FURTHER ASSURANCES

      7.1     Change of Name.  In the event that Seller changes its present name or Trade Name, or acquires an additional Trade Name other than those set forth in this Agreement, Seller must give written notice of any such name change to Purchaser within 10 days.

      7.2     Change of Chief Executive Office.  In the event that Seller changes its place of business or its chief place of business or chief executive office, as the case may be, to a place other than that set forth in Section 4.2, Seller must give written notice of any such change to Purchaser within 10 days.

      7.3     Maintenance of Books.  Seller must keep at its chief executive office for a period of five years all payroll and personnel records and all other books of account and business records customary for the industry, which books and records are subject to inspection by Purchaser and its agents and representatives during normal business hours.

8.     INDEMNIFICATION

      8.1     Indemnity.  Seller agrees to indemnify Purchaser against and save Purchaser harmless from any and all manner of suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Seller to perform or observe its obligations under this Agreement.

      8.2.     Independent Contractor.  It is understood and agreed that each party hereto is an independent contractor with respect to the other.  Nothing in this Agreement will be construed to constitute either party as the employee, representative or, except to the extent expressly provided herein, the agent of the other, or to constitute Purchaser and Seller as partners or joint ventures.  Seller will not have the power, and will not represent or imply that it has the power, to obligate Purchaser for any expenses, except as otherwise expressly agreed to in writing by Purchaser.

9.     ASSIGNABILITY

      9.1     Assignment.  This Agreement is personal to Seller and is not assignable or transferable by Seller, in whole or in part, either voluntarily or by operation of law, except with the prior written consent of Purchaser.  Any attempted assignment or transfer by Seller without the prior written consent of Purchaser will be void and unenforceable.  For all purposes of this Agreement, the transfer of a majority of the equity ownership of Seller, in one or more transactions, to any persons other than the present owners of Seller will be deemed an assignment of this Agreement.  This Agreement is binding upon and inures to the benefit of Purchaser and Seller, and their respective permitted successors and assigns.

10.     TERM OF AGREEMENT

      10.1     This Agreement is effective as of the date hereof and will continue in effect for twenty-four (24) months from the date hereof and will automatically be renewed for successive twenty-four (24) month periods (the "Term") unless either party gives the other party written notice of termination at least one hundred and twenty (120) days but no sooner than sixty (60) days before the end of the then current term, or until sooner terminated or modified by the parties in accordance with the terms and conditions of this Agreement.  No termination, expiration or modification of this Agreement will affect rights accrued under this Agreement prior to the date of such termination, expiration or modification.

11.     EVENT OF TERMINATION

      11.1     Event of Termination.  Each of the following will constitute an Event of Termination under this Agreement:

      (a)     If any representation, warranty or statement made in this Agreement by Seller is false or erroneous in any respect when made.

      (b)     If Seller fails to observe or perform any of its obligations under this Agreement, or if the Term expires.

      (c)     The suspension by Seller of the operation of the Business, or if Seller is subject to any Insolvency Action, or entry of any material lien against Seller.

      (d)     If Seller sells an Account to an entity other than Purchaser during the Term without the prior written consent of Purchaser.

      (e)     The uninsured loss, theft, damage or destruction, or encumbrance of any of the Collateral.

4

(f)      If there occurs a material adverse change in the business, assets or financial condition of Seller or if Purchaser deems itself insecure.

(g)      If during any consecutive 4 week period commencing 6 months after the date hereof, Seller's average weekly Assigned Accounts do not equal or exceed Minimum Billings, Purchaser may terminate this Agreement, such termination to be effective 60 days after Purchaser gives written notice of its election to terminate.

11.2    Remedies on Event of Termination.  If an Event of Termination has occurred, to the extent permitted by applicable law and in addition to any other right or remedy provided for in this Agreement:

(a)      Purchaser may suspend its performance under this Agreement, and may set off against any obligation due Seller an amount equal to any and all obligations of Seller owed to Purchaser, whether matured, unmatured or contingent.

(b)      Purchaser may immediately accelerate all obligations of Seller owing to Purchaser.

(c)      Purchaser may take any actions Purchaser deems reasonably necessary to collect the Assigned Accounts.

(d)      Purchaser may exercise in respect of the Collateral, in addition to other rights and remedies provided for in this Agreement or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) and under any other applicable personal property security legislation, and also may (i) require Seller to, and Seller hereby agrees that it will at its expense and upon request of Purchaser, assemble all or part of the Collateral as directed by Purchaser and make it available to Purchaser at a place to be designated by Purchaser which is reasonably convenient to both parties and (ii) without notice, except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Purchaser's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Purchaser may deem commercially reasonable.  Seller agrees that, to the extent notice of sale is required by law, at least 10 days' notice to Seller of the time and place of any public sale or the time after which any private sale is to be made constitutes reasonable notification.  Purchaser is not obligated to make any sale of Collateral regardless of notice of sale having been given.  Purchaser may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(e)      Purchaser may terminate this Agreement, or otherwise suspend its performance of this Agreement.

(f)      Purchaser may exercise any and all other legal and equitable rights available to Purchaser.

All of the foregoing rights and remedies are cumulative and not exclusive and, to the extent permitted by law, are in addition to any other rights or remedies provided by law.

11.3    Remedies on Potential Event of Termination.  If a Potential Event of Termination has occurred, Purchaser may suspend its performance under this Agreement.

12.0    Miscellaneous.

12.1    Purchaser Appointed Attorney-in-Fact.  Seller hereby irrevocably appoints Purchaser as Seller's attorney-in-fact, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time in Purchaser's discretion, to take any action and to execute any instrument which Purchaser may deem necessary or advisable to accomplish the purposes of this Agreement including:

(a)      to sign, in the name and on behalf of Seller, any such documents that Purchaser may reasonably deem necessary or desirable to pledge and collect the Assigned Accounts and other Collateral;

(b)      to verify with Customers all Assigned Accounts;

(c)      to send requests to Customers pursuant to which Customers acknowledge Assigned Accounts and confirm that such Customer has no claims, defenses, offsets or counterclaims with respect to such Assigned Account;

(d)      to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Assigned Accounts and the other Collateral;

(e)      to receive, endorse, and collect any drafts or other instruments, documents and chattel paper; and

(f)      after the occurrence of an Event of Termination, to file any claims or take any action or institute any proceedings which Purchaser may deem necessary or desirable for the collection of any of the Collateral or the rights of Purchaser with respect to any of the Collateral.

12.2    Notices.  All notices, requests, demands and other communications provided for hereunder must be in writing and must be given solely: (a) by hand delivery or by overnight courier delivery service, with all charges paid, (b) by facsimile transmission, if confirmed same day in writing by first-class mail sent, or (c) by registered or certified mail, postage prepaid and addressed to the parties.  For the purposes of this Agreement, such notices will be deemed to be given and received: (a) if by hand or by overnight courier service, upon actual receipt, (b) if by facsimile transmission, upon receipt of machine-generated confirmation of such transmission (and provided the above-stated written confirmation is sent), or (c) if by registered or certified mail, upon the first to occur of actual receipt or the expiration of 48 hours after deposit with the U.S. Postal Service.  Notices or other communications hereunder will be addressed to a party at the addresses specified in the preamble of this Agreement, or to such other address as may be furnished in writing by a party to the other party.

12.3    Severability.  If any term or provision of this Agreement is found invalid or unenforceable, such invalidity or unenforceability will not affect the remaining provisions of this Agreement, which will remain in full force and effect as though such invalid or unenforceable provisions had not been contained in this Agreement.

12.4    Entire Agreement.  This Agreement, including the documents referenced herein, contains the entire Agreement between Purchaser and Seller; and there are no representations, inducements, arrangements, promises or agreements outstanding between them, either oral or in writing, other than those contained in this Agreement.

5

12.5    _Arbitration, Jurisdiction and Venue._    At Purchaser's sole discretion, Purchaser shall have the right to have any dispute or disagreement between the parties arising out of or relating to this Agreement, or the transactions or relationships contemplated hereby, resolved by arbitration under the commercial arbitration rules then obtaining of the American Arbitration Association, by a single arbitrator, selected by Purchaser, which arbitration shall be conducted in Cuyahoga County, Ohio, where Purchaser has its principal offices and where Purchaser has accepted this Agreement and will perform its obligations hereunder.  The AAA arbitrator's decision shall be final and binding, and any court of competent jurisdiction may enter judgment upon the award in accordance with applicable law.  The parties acknowledge and agree that resolution of any disputes or disagreements by arbitration is at the sole and exclusive option of Purchaser.

Seller further submits to the jurisdiction of the Courts of the State of Ohio, with venue at the Cuyahoga County Court of Common Pleas, Cuyahoga County, Ohio.  In the event of removal to a Federal Court, such court shall be the District Court for the Northern District of Ohio, Eastern Division.  Seller expressly waives the jurisdiction of any other court, and acknowledges and agrees that this Agreement, without more, shall be sufficient to sustain the dismissal of an action commenced by Seller in any court other than specified in this Agreement.

12.6    _Governing Law._  This Agreement will be governed by, construed and enforced in accordance with, the laws of the State of Ohio, without reference to any conflicts of law principles.

12.7    _Failure to Perform._  Purchaser will not be liable or responsible in any manner to Seller for Purchaser's failure to perform or delay in performance of the terms of this Agreement when such failure or delay is due to either the direct or indirect result of strikes or other labor troubles, fires, flood, material or labor shortages, equipment failure, postal mailing delay, embargoes, stoppages in transit, acts, regulations, or order of governments, war, sabotage, civil insurrection, acts of God or the public enemy, or any other causes beyond the reasonable control of Purchaser.

12.8    _Maximum Interest Rate._  Seller and Purchaser intend to comply with all applicable laws in effect from time to time limiting the maximum rate of interest that may be charged or collected.  Accordingly, notwithstanding any other provision hereof, Seller shall not be required to make any payment to or for the account of the Purchaser to the extent that such requirement would violate or conflict with nonwaivable provisions of applicable laws limiting the maximum amount of interest which may be charged or collected, and any payment so made by Seller shall be applied to amounts determined to be principal.

12.9    _Disclaimer of Liability._  IN NO EVENT WILL PURCHASER BE LIABLE TO SELLER FOR ANY LOST PROFITS, LOST SAVINGS OR OTHER CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES RESULTING FROM OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS OR RELATIONSHIPS CONTEMPLATED HEREBY OR PURCHASER'S PERFORMANCE OR FAILURE TO PERFORM HEREUNDER, EVEN IF PURCHASER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER:
Biltres Staffing of Tampa Bay, LLC

By: _____

Its: _Pres.denT_____

Date: _4/20/2011_____


PURCHASER:
Accepted in Cuyahoga County, Ohio
This _20_ day of _April_, _____

TEMPAY INC.

By: _____
    Larry Holstein
Its:    President


Notary Acknowledgement for Staffing Service:

STATE OF _FLoLida_ )

COUNTY OF _Hillsborough_ )

I, _Mark Leimkuehler_, a Notary Public for said County
and State, certify that _Otto Biltres_ personally
came before me this day and acknowledged that he (or she)
is _____ of _____ a
corporation, and that by authority duly given and as the
act of the corporation the instrument was signed in
its name by him (or her)
Witness my hand and official seal, this _20_ day of
_April_, 20 _11_

       (Official Seal)

                        _Mark Leimkuehler_
                        Notary Public
My commission expired: _11/17_, 20 _14_

MARK LEIMKUEHLER
Notary Public - State of Florida
My Comm. Expires Nov 17, 2014
Commission # EE 12840

## GUARANTY

In order to induce Purchaser to execute and perform the foregoing Agreement, the undersigned, each a party representing himself or herself as having an economic interest in Seller, hereby personally, absolutely and unconditionally, jointly and severally, guarantee to Purchaser the full and timely payment, and performance and observance, by Seller of its obligations under this Agreement. This Guaranty is a guaranty of performance and payment and not of collection, and each of the undersigned understands that Purchaser may proceed to enforce its rights hereunder against the undersigned or any of them, without being obligated to first or concurrently proceed against Seller under the foregoing Agreement, or any other of the undersigned, under this Guaranty.

Individually and Personally _____

Print name _____ Otto Biltres _____

Address _1272 Jasmine Lake Dr. Tarpon Springs, Fl. 34689_

Individually and Personally _Constandina Biltres_

Print name _Constandina Biltres_____

Address _1272 Jasmine Lake Dr. Tarpor Springs Fl. 34689_

**COMPOSITE EXHIBIT C**

Filed with: Secretary of State of State of Florida

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER** [optional]
Maria J. Wing – 215-564-8108

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Maria J. Wing
Stradley Ronon, LLP
2600 One Commerce Square
Philadelphia, PA  19103

23648705

**FLORIDA SECURED TRANSACTION REGISTRY**

# FILED

2010 Jul 12 10:16 PM

****** 201002841818 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| **200807721377, dated 2/25/08** | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partially). Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☒ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☒ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.     ☐ DELETE name: Give record name to be deleted in item 6a or 6b.     ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. **CURRENT RECORD INFORMATION**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| The Huntington National Bank | | | |

| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

7. **CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Sterling National Bank | | | |

| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 500 Seventh Avenue, 10th floor | New York | NY | 10018 | USA |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| The Huntington National Bank | | | |

| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

10. OPTIONAL FILER REFERENCE DATA    BILTRESS STAFFING OF TAMPA BAY, LLC

FILING OFFICE COPY – UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

# 1145515  v. 1

**FLORIDA SECURED TRANSACTION REGISTRY**

# FILED

## 2008 Feb 25 AM 12:00

**\*\*\*\* 200807721377 \*\*\*\***

**\*\*\*D \* 20010000A0-28.00\*\*\*28.00\*\*\***

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**                                         DCK

Corporation Service Company
1201 Hays Street
Tallahassee, FL 32301

458562-1

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Biltres Staffing of Tampa Bay, LLC | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11928 Sheldon Road, Suite 102 | Tampa | FL | 33636 | USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION LLC | 1f. JURISDICTION OF ORGANIZATION FL | 1g. ORGANIZATIONAL ID #, if any L08000005962 □ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any □ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| The Huntington National Bank | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 917 Euclid Avenue | Cleveland | OH | 44122 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

Florida Documentary Stamp Tax is not Required
All present and future Accounts Receivables, Instruments, Documents, Chattel Paper and General
Intangibles now owned or hereafter acquired by Biltres Staffing of Tampa Bay, LLC in connection
with the operation of its business, and all proceeds thereof including but not limited to deposit
accounts into which Biltres Staffing of Tampa Bay, LLC accounts receivable are deposited.
Collateral does not include furniture, fixtures, equipment or inventory. Proceeds of collateral
are also covered.

| 5. ALTERNATIVE DESIGNATION [if applicable] | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional] (ADDITIONAL FEE) | | | All Debtors | Debtor 1 | Debtor 2 |

**8. OPTIONAL FILER REFERENCE DATA**

FL-Secured Transaction Registry

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

**FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)**

# UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | Biltres Staffing of Tampa Bay, LLC | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
| | | | |

**10. MISCELLANEOUS:** FL—Secured Transaction Registry

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**12.** ☐ ADDITIONAL SECURED PARTY'S _or_ ☒ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | TemPay, Inc. | | | |
| | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 20600 Chagrin Blvd., Suite 503 | Shaker Heights | OH | 44122 | USA |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

**14.** Description of real estate:

**16.** Additional collateral description:

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

**17.** Check _only_ if applicable and check _only_ one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check _only_ if applicable and check _only_ one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# EXHIBIT D

## MASTER FACTORING AGREEMENT

THIS MASTER FACTORING AGREEMENT (this "Agreement") dated as of October 10, 2011, is made by and between Bittres Staffing of Tampa Bay, LLC a Florida Limited Liability Company ("Seller") whose mailing address is 11928 Sheldon Road, Suite 102, Tampa, FL 33626 and TEMPAY INC, an Ohio corporation ("Purchaser") whose mailing address 20600 Chagrin Blvd Ste 503, Cleveland, Ohio 44122.

### PRELIMINARY STATEMENTS:

A.    Seller is in the business of providing temporary help services to other businesses.

B.    Seller desires to sell, and Purchaser desires to purchase, certain accounts receivable of Seller.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, Purchaser and Seller agree as follows:

1.    DEFINITIONS

As used in this Agreement, the words and terms listed below will have the following meanings (words and terms that are defined in the plural will include the singular):

"Accounts" means the accounts receivable of Seller, and any rights to payment for services rendered by Seller, in connection with or arising from the conduct of the Business, including all proceeds thereof.

"Assigned Accounts" means the Accounts purchased by Purchaser pursuant to an Assignment and subject to the provisions of this Agreement.

"Assignment" means an Assignment of an Account by Seller to Purchaser in the form attached hereto as Annex I.

"Business" means the temporary help service business operated by Seller.

"Collateral" has the meaning given to such term in Section 5.1 of this Agreement.

"Customers" means clients or customers of the Business who engage the services of temporary help employees furnished by Seller.

"Delinquent Account" means any Account that: (i) has been unpaid for more than ninety (90) days from its billing date; (ii) is owed by any Customer that is subject to any Insolvency Action; or (iii) is owed by a Customer as to which Purchaser has a reasonable basis for believing is about to become subject to an Insolvency Action.

"Direct Payroll Costs" means the employer's share of federal social security and Medicare taxes, federal and state unemployment taxes and any other direct or indirect taxes, not including workers' compensation insurance premiums or sales taxes, that are based on wages, sales or receipts that may be levied and that are the responsibility of an employer or provider of temporary employment services to collect and/or remit.

"Event of Termination" has the meaning given to such term in Section 11.1 of this Agreement.

"Finance Company" means a bank or financing company.

"Initial Advance" means the amount initially advanced by Purchaser to Seller for the assignment of an Account, as set forth on an Assignment, which shall be ninety percent (90%) of Invoice Amount.

"Insolvency Action" means, with respect to any person, (i) the inability or admission that it is unable to make timely payment on its debts, obligations or liabilities as they become due, (ii) the voluntary seeking of the appointment of, or the involuntary appointment of, any receiver, trustee or similar officer, (iii) the making of an assignment for the benefit of creditors, (iv) being subject to an order for relief entered in any case commenced by it under the federal bankruptcy laws, as now or hereafter in effect, or in any proceeding under any federal or state bankruptcy, insolvency, reorganization, arrangement or similar law, or the commencement of such a proceeding against it on an involuntary basis, (v) insolvency, or (vi) the entry of any material judgment against that person.

"Late Account" means any Account that has been unpaid for more than one (1) day from its billing date.

"Minimum Billing" means five thousand dollars ($5,000.00) of Assigned Accounts during a single week.

"Potential Event of Termination" means an event or condition that, after notice or lapse of time, or both, would constitute an Event of Termination.

"Purchaser's Fee" means the amount of the fee to be paid by Seller to Purchaser for the assignment of an Account and the administration thereof by Purchaser, as set forth on the Assignment, which will be one and sixty-three one hundredths percent (1.63%) of the Invoice Amount.

"Receipts" means any payments or remittances of a Customer in respect of an Account, in any form whatsoever.

"Term" has the meaning given to such term in Section 10 of this Agreement.

"Trade Name" means the name under which Seller conducts its Business from time to time during the term of this Agreement.   At the time of execution, Seller's Trade Name is Bittres Staffing of Tampa Bay, LLC.

"UCC" means the Uniform Commercial Code now or hereafter in effect of the State of Florida.

2.    PURCHASE AND SALE OF ACCOUNTS

2.1    Purchase of Accounts.    Throughout the Term, and subject to the terms of this Agreement, Seller shall offer to sell to Purchaser all of Seller's Accounts, and Purchaser, in its sole discretion, shall have the option to purchase from Seller any or all of the Accounts so offered. During the Term, Seller may not offer any Account for sale to another Person, unless that Account is first offered to Purchaser and Purchaser decides not to Purchase that Account.  Each Account that Purchaser, in its sole discretion, elects to purchase from Seller shall be identified and transferred by an Assignment.  Each Assignment shall be subject to the rights and obligations of Purchaser and Seller under this Agreement and shall constitute a sale, transfer and assignment of all Seller's right, title and interest in and to the Assigned Account described therein.  The parties contemplate that the Accounts

purchased by Purchaser during the Term will exceed $5,000 in the aggregate, but Seller agrees that Purchaser has no obligation to purchase any Account; and Seller shall not assert any claim that Purchaser has any such obligation or liability to Seller for failure to purchase any Account.

2.2     Assignments.  In addition to describing the Assigned Account, each Assignment shall indicate the Initial Advance and Purchaser's Fee.  Upon execution of an Assignment by both parties, Purchaser shall pay the Initial Advance to Seller and shall be entitled to receive the Purchaser's Fee set forth therein.

2.3     Purchaser's Rights.  Purchaser will have the exclusive right to receive, retain and apply all Receipts in accordance with this Agreement.  Seller irrevocably and unconditionally authorizes Purchaser to receive, endorse and collect any and all Receipts.  Purchaser further has the unqualified right to control all matters relating to the collection, settlement, compromise or adjustment of Assigned Accounts, including the right to give notice to Customers to make payment directly to Purchaser or to its order, the right to bring all proceedings for collection in Purchaser's or Seller's name, and to exercise Seller's rights to stoppage in transit, replevin and reclamation.  Purchaser is entitled to settle, compromise or adjust all disputes or claims directly with Customers on such terms as Purchaser, in its sole discretion, may determine without affecting the liability of Seller under this Agreement.  In the event that Purchaser accepts payment of less than the full amount of any Assigned Account from any Customer, the amount of such reduction shall constitute indebtedness which is immediately due and payable by Seller to Purchaser.  Purchaser expressly reserves the right to offset uncollected payment of any Account against all other Accounts.

2.4     Lock Box.  Seller acknowledges and agrees that Purchaser has established a lock box for Receipts.  All invoices with respect to Accounts sent by the Seller to Customers shall show on the face thereof the following legend and Seller shall not change such legend or permit any Customers to deviate from the payment instructions therein:

This account receivable has been assigned to and is owned by or subject to a security interest of TemPay Inc and is payable only in United States Dollars.  All payments shall be made payable to Bitres Staffing of Tampa Bay, LLC and sent to TemPay, Inc. JAF Station, Post Office Box 3249, New York, NY 10116-3249.

If, notwithstanding such instructions, Seller receives any Receipt, Seller shall receive such Receipt in trust for Purchaser, and shall immediately deliver such Receipt to Purchaser in its original form duly endorsed in blank.  The provisions of this Section 2.4 are applicable even in the event that Purchaser has purchased some, but not all, of the Accounts due from a Customer.  In the event of such a partial purchase, Purchaser shall be entitled to all payments received from that Customer, whether paid by that Customer to Purchaser or to Seller, until all amounts due to Purchaser for the Assigned Accounts due from such Customer have been paid to Purchaser.

2.5     Reserve Account.
(a)     In order to protect Purchaser's rights under this Agreement, Purchaser shall create as a matter of record keeping a reserve account (the "Reserve").  The Reserve shall be an amount equal to the total of the outstanding invoice amounts for all Assigned Accounts, reduced by the sum of: (i) the Initial Advances; (ii) all payments to Seller made pursuant to this Section 2.5; and (iii) all amounts applied by Purchaser to the payment or satisfaction of any of Seller's obligations under this Agreement, including the Purchaser's Fees and any amounts for which Purchaser is entitled pursuant to Section 8.1 of this Agreement.  On Friday of each week during the Term, Purchaser shall remit to Seller that portion of the Reserve representing the proceeds of Assigned Accounts that have been paid in full by Customers to Purchaser during the preceding week.

(b)     In addition to any other right or remedy provided for in this Agreement, Purchaser shall have the right to charge against the Reserve: (i) the full amount Purchaser has advanced, including any fees and costs, with respect to any Assigned Account that has become a Delinquent Account; and (ii) any amounts due Purchaser pursuant to Section 2.3 of this Agreement.  In the event that for whatever reason the balance in the Reserve is insufficient to pay to or reimburse Purchaser for the full amount then owed by Seller and permitted to be charged against the Reserve, the balance shall constitute indebtedness which is immediately due and payable by Seller to Purchaser.  Any such indebtedness shall bear interest at the rate of one and one half percent (1.5%) per month until paid.  The charging of any disputed Assigned Account against the Reserve shall not be deemed a reassignment thereof but shall merely constitute a bookkeeping entry, and title to such Assigned Account shall remain with Purchaser as security for any obligations of Seller due or to become due under this Agreement.

2.6     Late Accounts.  Seller shall pay to Purchaser a late payment fee in an amount equal to one thirtieth of one percent (approximately 0.0333333%) per day in respect of each Late Account for each day that an Assigned Account is a Late Account.

2.7     Delinquent Accounts.  Notwithstanding any provision in this Agreement to the contrary, the full amount of each Delinquent Account will be deducted from any amounts to be paid by Purchaser to Seller (including Initial Advances to be paid in connection with any future Assigned Accounts), on the ninety first (91st) day after the billing date or, at Purchaser's election, paid by Seller to Purchaser upon demand.  Payment received by Purchaser in the form of a check will be deemed to have been made when the funds represented thereby are available to Purchaser.  Notwithstanding any provision herein to the contrary, Seller agrees to pay to Purchaser an amount equal to any unpaid Assigned Account that has become a Delinquent Account.

3.      DUTIES OF SELLER
3.1     Operation of the Business.  Seller agrees to operate the Business in accordance with this Agreement and in full compliance with all applicable federal, state and local laws, rules and regulations.  Seller further agrees to promptly provide to Purchaser from time to time proof of payment of all Direct Payroll Costs.

3.2     Credit Information.  Seller agrees to develop and maintain sufficient credit information concerning all Customers and any prospective Customers and to provide that credit information to Purchaser on a timely basis so that Purchaser may make an effective evaluation of Customers, prospective Customers and Assigned Accounts.

3.3     Customers.  Seller will not change any of the terms of any Assigned Account without Purchaser's prior written consent.

2

3.4    <u>Billing Information</u>. Seller agrees to maintain all payroll and billing information related to the Assigned Accounts as Purchaser may reasonably request from time to time, all on forms approved in writing by Purchaser.

3.5    <u>Legal Cooperation</u>. Seller agrees to forward promptly to Purchaser, or to such persons as Purchaser may otherwise direct, copies of each and every summons, court order, garnishment, subpoena, process or notice of order for appearance in any suit or proceeding in which Purchaser or Seller may be involved. Seller further agrees to cooperate with Purchaser's attorneys and insurance carriers in the defense of any suit or proceeding in which Purchaser or Seller may be involved.

3.6    <u>Workers' Compensation Insurance</u>. Seller agrees, at its expense, to report and pay in a timely manner to the appropriate agencies all workers' compensation premiums. Throughout the Term, Seller will furnish Purchaser with current certificates of insurance from the appropriate insurers certifying that Workers' Compensation Insurance has been issued in the amounts required by law covering the employees of Seller.

3.7    <u>Fidelity Bond</u>. Seller agrees, at its own cost, to maintain for the benefit of Seller in the conduct of the Business throughout the Term, a third-party fidelity bond with respect to Seller's permanent employees in the amount of at least $100,000, subject to a deductible of no more than $5,000 per occurrence. The limit described is a minimum amount that does not reflect a recommendation by Purchaser as to the amount of insurance coverage to be maintained by Seller. Purchaser recommends that Seller maintain such additional insurance coverage in such amounts and types as may be customary in the temporary help services business. Without cost to Purchaser, such policy of insurance will name Purchaser as an additional insured and will include a provision that such policy may not be terminated or materially amended except after 30 days' prior written notice to Purchaser. Within 10 days of Purchaser's written request, Seller will provide Purchaser with certificates of all such insurance policies.

3.8    <u>Exclusive Agreement</u>. Seller agrees during the Term to sell its Accounts on an exclusive basis to Purchaser. Seller further agrees, during the term this Agreement and so long as any obligations remain outstanding, Seller will not obtain factoring or other financing for the Employee payroll and Accounts Receivable generated by its business from any other source, nor shall any affiliated person or entity obtain such factoring or financing.

4.      REPRESENTATIONS AND WARRANTIES OF SELLER

4.1    <u>Authority of Seller</u>. Seller is a Corporation duly organized, validly existing and in good standing in the State of Florida. Seller has all power and authority to carry on the Business and to execute and deliver this Agreement and to perform the transactions contemplated by this Agreement, all of which have been duly authorized by all necessary and proper corporate, company, or other similar actions.

4.2    <u>Location of Chief Executive Office and Assigned Accounts</u>. The sole place of business, or if it has more than one place of business, the chief place of business and chief executive office, of Seller and the office where Seller keeps its records concerning the Assigned Accounts is located at 11928 Sheldon Road, Suite 102, Tampa, FL 33626. The tangible personal property of Seller that constitutes a portion of the Collateral is located at 11928 Sheldon Road, Suite 102, Tampa, FL 33626.

4.3    <u>Trade Names</u>. Seller conducts its Business under the Trade Name. Seller does not own any other trade name and is not licensed to use any other trade name except the following: Blitres Staffing of Tampa Bay, LLC. Seller has not used any other trade name within the last five years, except as set forth on Exhibit A attached hereto.

4.4    <u>Binding Effect of Documents</u>. This Agreement is the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

4.5    <u>No Violation of Agreements</u>. The execution and delivery of this Agreement by Seller does not violate any agreement or instrument to which Seller is a party.

4.6    <u>Ownership of Assigned Accounts</u>. Seller is the legal and beneficial owner of each Assigned Account and the other Collateral free and clear of any lien, security interest, pledge, option, restriction or other encumbrance except the security interests created by or pursuant to this Agreement. No financing statement or other instrument similar in effect covering all or any part of any Assigned Account or the other Collateral is on file in any recording office, except such as may have been filed in connection with this Agreement. All work relating to any Assigned Account has been completed in a good, workmanlike manner and no Customer has any right to reject the services covered by such Assigned Account.

4.7    <u>Authority to Assign Assigned Accounts</u>. There are no express or implied conditions precedent to the collection of any Assigned Account. All documents relating to Assigned Accounts are genuine and constitute the legally valid and binding obligations of the parties thereto. Seller has remitted any and all excise and sales taxes imposed with respect to the sales giving rise to such Assigned Account to the appropriate governmental or regulatory authority. All Assigned Accounts will be paid in accordance with their respective terms.

4.8    <u>Valid and Perfected First Priority Security Interest</u>. This Agreement, together with the filing of financing statements under the UCC, creates a valid and perfected security interest in the Assigned Accounts and the other Collateral.

4.9    <u>Business Purpose</u>. The funds paid to the Seller will be used solely for the Seller's business purposes and not for personal, family or household purposes.

4.10    <u>Full Disclosure</u>. Seller has provided all information requested in writing by Purchaser, and all such information is complete and accurate in all material respects. None of the written information, exhibits or reports furnished by Seller omit to state any fact necessary to make the statements contained therein not misleading.

5.      GRANT OF SECURITY INTEREST

5.1    <u>Pledge, Assignment and Grant of Security Interest</u>. Seller pledges and assigns to Purchaser, and grants to Purchaser a continuing security interest in, all Seller's right, title and interest in and to the Collateral, whether now or hereafter existing and wherever located, to secure the payments due to Purchaser under this Agreement and the performance and observance by Seller of all its obligations under this Agreement. As used in this Agreement, Collateral means: (a) the Assigned Accounts and all other Accounts; (b) equipment and inventory (including materials and supplies) of any kind whatsoever; (c) general intangibles, books, records and other documents relating to the inventory, accounts and equipment; (d) deposit accounts, notes, certificates of deposit, deposit accounts, checks and other instruments; and (e) all cash and non-cash proceeds of (a) through (d) above and, to the extent not otherwise included, all payments under insurance (whether or not Purchaser is the loss payee thereof), or any indemnity, warranty or guaranty,

payable by reason of loss or damage to or otherwise with respect to any of the foregoing, in each case, howsoever Seller's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

5.2   Financing Statements.  Seller consents to the signing and filing by Purchaser, without a signature on behalf of Seller, or to the signing thereof by Purchaser on behalf of Seller, of all UCC financing statements or other forms deemed necessary or appropriate by Purchaser, in its sole discretion, in order to perfect, continue and protect the security interest granted by Seller to Purchaser under this Agreement.

5.3   Cooperation.  Seller agrees that in the event Purchaser elects to pledge such Assigned Accounts and/or any other Collateral as security for a loan or loans extended to Purchaser by a Finance Company, Seller, at its expense, will cooperate fully with Purchaser and execute any and all requested documents that may be reasonably required by either Purchaser or the Finance Company to effectuate such financing arrangements, including security agreements and UCC filings.  Seller further agrees, at its expense, that it will promptly take all further action that may be reasonably necessary or desirable, or that Purchaser may reasonably request, in order to perfect and protect the security interest granted or purported to be granted by this Agreement to enable Purchaser to exercise and enforce its rights and remedies with respect to any of the Collateral.

6.   CONFIDENTIALITY

6.1  Confidentiality.  Seller agrees that the terms, the Purchaser's business methods and trade secrets, and any and all other records and information clearly and specifically identified by Purchaser as confidential will be held by Seller in strict confidence and treated as the confidential property of Purchaser.  Seller will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose any of the foregoing to any Person, unless specifically authorized to do so in writing by Purchaser or unless required by law.  Purchaser agrees that any and all records and information clearly and specifically identified by Seller as confidential will be held by Purchaser in strict confidence and treated as the confidential property of Seller.  Purchaser will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose the records and information of Seller to any Person, unless specifically authorized to do so in writing by Seller or unless required by law.

7.   FURTHER ASSURANCES

7.1   Change of Name.  In the event that Seller changes its present name or Trade Name, or acquires an additional Trade Name other than those set forth in this Agreement, Seller must give written notice of any such name change to Purchaser within 10 days.

7.2   Change of Chief Executive Office.  In the event that Seller changes its place of business or its chief place of business or chief executive office, as the case may be, to a place other than that set forth in Section 4.2, Seller must give written notice of any such change to Purchaser within 10 days.

7.3   Maintenance of Books.  Seller must keep at its chief executive office for a period of five years all payroll and personnel records and all other books of account and business records customary for the Industry, which books and records are subject to inspection by Purchaser and its agents and representatives during normal business hours.

8.   INDEMNIFICATION

8.1   Indemnity.  Seller agrees to indemnify Purchaser against and save Purchaser harmless from any and all manner of suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Seller to perform or observe its obligations under this Agreement.

8.2   Independent Contractor.  It is understood and agreed that each party hereto is an independent contractor with respect to the other.  Nothing in this Agreement will be construed to constitute either party the employee, representative or, except to the extent expressly provided herein, the agent of the other, or to constitute Purchaser and Seller as partners or joint ventures.  Seller will not have the power, and will not represent or imply that it has the power, to obligate Purchaser for any expenses, except as otherwise expressly agreed to in writing by Purchaser.

9.   ASSIGNABILITY

9.1   Assignment.  This Agreement is personal to Seller and is not assignable or transferable by Seller, in whole or in part, either voluntarily or by operation of law, except with the prior written consent of Purchaser.  Any attempted assignment or transfer by Seller without the prior written consent of Purchaser will be void and unenforceable.  For all purposes of this Agreement, the transfer of a majority of the equity ownership of Seller, in one or more transactions, to any persons other than the present owners of Seller will be deemed an assignment of this Agreement.  This Agreement is binding upon and inures to the benefit of Purchaser and Seller, and their respective permitted successors and assigns.

10.   TERM OF AGREEMENT

10.1   This Agreement is effective as of the date hereof and will continue in effect for thirty-six (36) months from the date hereof and will automatically be renewed for successive twenty-four (24) month periods (the "Term") unless either party gives the other party written notice of termination at least one hundred and twenty (120) days but no sooner than sixty (60) days before the end of the then current term, or until sooner terminated or modified by the parties in accordance with the terms and conditions of this Agreement.  No termination, expiration or modification of this Agreement will affect rights accrued under this Agreement prior to the date of such termination, expiration or modification.

11.   EVENT OF TERMINATION

11.1   Event of Termination.  Each of the following will constitute an Event of Termination under this Agreement:

(a)   If any representation, warranty or statement made in this Agreement by Seller is false or erroneous in any respect when made.

(b)   If Seller fails to observe or perform any of its obligations under this Agreement, or if the Term expires.

(c)   The suspension by Seller of the operation of the Business, or if Seller is subject to any Insolvency Action, or entry of any material lien against Seller.

(d)   If Seller sells an Account to an entity other than Purchaser during the Term without the prior written consent of Purchaser.

(e)   The uninsured loss, theft, damage or destruction, or encumbrance of any of the Collateral.

4

(f)    If there occurs a material adverse change in the business, assets or financial condition of Seller or if Purchaser deems itself insecure.

(g)    If during any consecutive 4 week period commencing 6 months after the date hereof, Seller's average weekly Assigned Accounts do not equal or exceed Minimum Billings, Purchaser may terminate this Agreement, such termination to be effective 60 days after Purchaser gives written notice of its election to terminate.

11.2    Remedies on Event of Termination.  If an Event of Termination has occurred, to the extent permitted by applicable law and in addition to any other right or remedy provided for in this Agreement:

(a)    Purchaser may suspend its performance under this Agreement, and may set off against any obligation due Seller an amount equal to any and all obligations of Seller owed to Purchaser, whether matured, unmatured or contingent.

(b)    Purchaser may immediately accelerate all obligations of Seller owing to Purchaser.

(c)    Purchaser may take any actions Purchaser deems necessary to collect the Assigned Accounts.

(d)    Purchaser may exercise in respect of the Collateral, in addition to other rights and remedies provided for in this Agreement or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) and under any other applicable personal property security legislation, and also may (i) require Seller to, and Seller hereby agrees that it will at its expense and upon request of Purchaser, assemble all or part of the Collateral as directed by Purchaser and make it available to Purchaser at a place to be designated by Purchaser which is reasonably convenient to both parties and (ii) without notice, except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Purchaser's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Purchaser may deem commercially reasonable.  Seller agrees that, to the extent notice of sale is required by law, at least 10 days' notice to Seller of the time and place of any public sale or the time after which any private sale is to be made constitutes reasonable notification.  Purchaser is not obligated to make any sale of Collateral regardless of notice of sale having been given.  Purchaser may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(e)    Purchaser may terminate this Agreement, or otherwise suspend its performance of this Agreement.

(f)    Purchaser may exercise any and all other legal and equitable rights available to Purchaser.

All of the foregoing rights and remedies are cumulative and not exclusive and, to the extent permitted by law, are in addition to any other rights or remedies provided by law.

11.3    Remedies on Potential Event of Termination.  If a Potential Event of Termination has occurred, Purchaser may suspend its performance under this Agreement.

12.0    Miscellaneous.

12.1    Purchaser Appointed Attorney-in-Fact.  Seller hereby irrevocably appoints Purchaser as Seller's attorney-in-fact, with full authority in the place and stead of Seller and in the name of Seller or otherwise, from time to time in Purchaser's discretion, to take any action and to execute any instrument which Purchaser may deem necessary or advisable to accomplish the purposes of this Agreement including:

(a)    to sign, in the name and on behalf of Seller, any such documents that Purchaser may reasonably deem necessary or desirable to pledge and collect the Assigned Accounts and other Collateral;

(b)    to verify with Customers all Assigned Accounts;

(c)    to send requests to Customers pursuant to which Customers acknowledge Assigned Accounts and confirm that such Customer has no claims, defenses, offsets or counterclaims with respect to such Assigned Account;

(d)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Assigned Accounts and other Collateral;

(e)    to receive, endorse, and collect any drafts or other instruments, documents and chattel paper; and

(f)    after the occurrence of an Event of Termination, to file any claims or take any action or institute any proceedings which Purchaser may deem necessary or desirable for the collection of any of the Collateral or the rights of Purchaser with respect to any of the Collateral.

12.2    Notices.  All notices, requests, demands and other communications provided for hereunder must be in writing and must be given solely: (a) by hand delivery or by overnight courier delivery service, with all charges paid, (b) by facsimile transmission, if confirmed same day in writing by first-class mail sent, or (c) by registered or certified mail, postage prepaid and addressed to the parties.  For the purposes of this Agreement, such notices will be deemed to be given and received: (a) if by hand or by overnight courier service, upon actual receipt, (b) if by facsimile transmission, upon receipt of machine-generated confirmation of such transmission (and provided the above-stated written confirmation is sent), or (c) if by registered or certified mail, upon the first to occur of actual receipt or the expiration of 48 hours after deposit with the U.S. Postal Service.  Notices or other communications hereunder will be addressed to a party at the addresses specified in the preamble of this Agreement, or to such other address as may be furnished in writing by a party to the other party.

12.3    Severability.  If any term or provision of this Agreement is found invalid or unenforceable, such invalidity or unenforceability will not affect the remaining provisions of this Agreement, which will remain in full force and effect as though such invalid or unenforceable provisions had not been contained in this Agreement.

12.4    Entire Agreement.  This Agreement, including the documents referenced herein, contains the entire Agreement between Purchaser and Seller; and there are no representations, inducements, arrangements, promises or agreements outstanding between them, either oral or in writing, other than those contained in this Agreement.

5

12.5     Arbitration, Jurisdiction and Venue.     At Purchaser's sole discretion, Purchaser shall have the right to have any dispute or disagreement between the parties arising out of or relating to this Agreement, or the transactions or relationships contemplated hereby, resolved by arbitration under the commercial arbitration rules then obtaining of the American Arbitration Association, by a single arbitrator, selected by Purchaser, which arbitration shall be conducted in Cuyahoga County, Ohio, where Purchaser has its principal offices and where Purchaser has accepted this Agreement and will perform its obligations hereunder.  The AAA arbitrator's decision shall be final and binding, and any court of competent jurisdiction may enter judgment upon the award in accordance with applicable law.  The parties acknowledge and agree that resolution of any disputes or disagreements by arbitration is at the sole and exclusive option of Purchaser.

Seller further submits to the jurisdiction of the Courts of the State of Ohio, with venue at the Cuyahoga County Court of Common Pleas, Cuyahoga County, Ohio.  In the event of removal to a Federal Court, such court shall be the District Court for the Northern District of Ohio, Eastern Division.  Seller expressly waives the jurisdiction of any other court, and acknowledges and agrees that this Agreement, without more, shall be sufficient to sustain the dismissal of an action commenced by Seller in any court other than specified in this Agreement.

12.6     Governing Law.  This Agreement will be governed by, construed and enforced in accordance with, the laws of the State of Ohio, without reference to any conflicts of law principles.

12.7     Failure to Perform.  Purchaser will not be liable or responsible in any manner to Seller for Purchaser's failure to perform or delay in performance of the terms of this Agreement when such failure or delay is due to either the direct or indirect result of strikes or other labor troubles, fires, flood, material or labor shortages, equipment failure, postal mailing delay, embargoes, stoppages in transit, acts, regulations, or order of governments, war, sabotage, civil insurrection, acts of God or the public enemy, or any other causes beyond the reasonable control of Purchaser.

12.8     Maximum Interest Rate.  Seller and Purchaser intend to comply with all applicable laws in effect from time to time limiting the maximum rate of interest that may be charged or collected.  Accordingly, notwithstanding any other provision hereof, Seller shall not be required to make any payment to or for the account of the Purchaser to the extent that such requirement would violate or conflict with nonwaivable provisions of applicable laws limiting the maximum amount of interest which may be charged or collected, and any payment so made by Seller shall be applied to amounts determined to be principal.

12.9     Disclaimer of Liability.  IN NO EVENT WILL PURCHASER BE LIABLE TO SELLER FOR ANY LOST PROFITS, LOST SAVINGS OR OTHER CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES RESULTING FROM OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS OR RELATIONSHIPS CONTEMPLATED HEREBY OR PURCHASER'S PERFORMANCE OR FAILURE TO PERFORM HEREUNDER, EVEN IF PURCHASER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER:
Biltres Staffing of Tampa Bay, LLC

By: _____

Its: _Presidegt_____

Date: _9/27/2011_____


PURCHASER:
Accepted in Cuyahoga County, Ohio
This _10th_ day of _October_, _2011_

TEMPAY INC

By: _____
         Larry Holstein
Its:     President


Notary Acknowledgement for Staffing Service:

STATE OF _Florida_   )
COUNTY OF _Hillsborough_ )

I, _Mark Leimkuehler_ a Notary Public for said County
and State, certify that _mr Bittlec_ personally
came before me this day and acknowledged that he (or she)
is _____ of _____ a
corporation, and that by authority duly given and as the
act of the corporation the instrument was signed in
its name by him (or her)·
Witness my hand and official seal, this _27_ day of
_September_, 20_11_

         (Official Seal)         _Mark Leimkuehler_
                                   Notary Public
My commission expired: _11/17_, 20_14_

MARK LEIMKUEHLER
Notary Public - State of Florida
My Comm. Expires Nov 17, 2014
Commission # EE 12840

## GUARANTY

In order to induce Purchaser to execute and perform the foregoing Agreement, the undersigned, each a party representing himself or herself as having an economic interest in Seller, hereby personally, absolutely and unconditionally, jointly and severally, guarantee to Purchaser the full and timely payment, and performance and observance, by Seller of its obligations under this Agreement. This Guaranty is a guaranty of performance and payment and not of collection, and each of the undersigned understands that Purchaser may proceed to enforce its rights hereunder against the undersigned or any of them, without being obligated to first or concurrently proceed against Seller under the foregoing Agreement, or any other of the undersigned, under this Guaranty.

Individually and Personally _____

Print name _Otto Ritter_____

Address _1272 Jasmine Lake Dr. Tarpon_
                    _Springs, FL_
                    _34689_

Individually and Personally _____

Print name _____

Address _____

**COMPOSITE EXHIBIT E**

**From:** Michelle Morris [mailto:mmorris@rbaprint.com]
**Sent:** Wednesday, November 30, 2011 11:52 AM
**To:** Brian Keuper
**Subject:** RE: Suspicion of Fraud / Biltres Staffing

I have received your information.  Yikes!  You are correct.

1.  Marty Jones is not an employee of RBA Print Communications.*
2.  We do not do business with Biltres.

Did you get any SS# for these employees?  I will gladly speak with Andy when he arrives.

The only thing I can think of is that someone came into our office and picked up a business card and used our info on the card.

**Michelle Morris**
**President**
**RBA Print Communications**
**mmorris@rbaprint.com**
**813.888.6117**



---

**From:** Brian Keuper [mailto:bkeuper@tempay.com]
**Sent:** Wednesday, November 30, 2011 11:19 AM
**To:** mmorris@rbaprint.com
**Subject:** Suspicion of Fraud / Biltres Staffing

Hi Michelle,

Per our conversation, I have attached the following documents for your review:

**Statement of Account – dated 11/30/11 – RBA Print Communications**
**RBA Print Communication Checks for payment of Biltres Staffing Invoices**
**Biltres Staffing Invoice #10031 dated 11/28/11 $55,098.28**

Please see e-mail below from Marty Jones verifying Statement of Account dated 10/5/11. I want to keep you in the loop on this matter. Andy Ditsler from my office will be stopping by later today. As you stated on the phone, Marty Jones is not employed by RBA Print Communications and you do not do business with Biltres Staffing. Please call me if you need any additional information. Thank you.

*Brian R. Keuper*
*Client Relations Manager*
*TemPay, Inc.*
*(216) 283-6666 - office*
*(216) 283-6796 - fax*
*(440) 315-6051 - cell*
*bkeuper@tempay.com*
www.tempaystaffingtimes.com

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

**From:** Jackie Rhodes

**Sent:** Wednesday, October 26, 2011 9:32 AM
**To:** Brian Keuper
**Subject:** FW: Biltres Staffing 10/5/11 Audit of Account / RBA Print Communications

FYI


*Jackie Rhodes*
*Credit Analyst*
*TemPay, Inc*
*phone: 216.283.6666*
*fax: 216.283.6796*
*email: jrhodes@tempay.com*

**From:** Marty Jones [mailto:marty.jones@rbaprintinc.com]
**Sent:** Monday, October 10, 2011 9:57 AM
**To:** Jackie Rhodes
**Subject:** Re: Biltres Staffing 10/5/11 Audit of Account / RBA Print Communications

Hello Jackie,
According to our audit, all the information is correct and balances match.
Thanks!
Marty Jones


**From:** Jackie Rhodes <jrhodes@tempay.com>
**To:** 'Marty Jones' <marty.jones@rbaprintinc.com>
**Cc:** Brian Keuper <bkeuper@tempay.com>
**Sent:** Wednesday, October 5, 2011 12:17 PM
**Subject:** Biltres Staffing 10/5/11 Audit of Account / RBA Print Communications

Hi Marty,
    We are conducting an audit of the amount that is currently owing to Biltres Staffing from RBA Print Communications. I have attached a 10/5/11 Statement of Account illustrating all Biltres Staffing invoices that remain open under RBA Print Communications totaling **$359,171.47.** Please send an e-mail back to confirm that the attached information is correct. Please feel free to contact me if you need additional information or need copies of any listed invoices.
Thank you,
*Jackie Rhodes*
*Credit Analyst*
*TemPay, Inc*
*phone: 216.283.6666*
*fax: 216.283.6796*
*email: jrhodes@tempay.com*

---

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.1873 / Virus Database: 2102/4648 - Release Date: 11/30/11



# ALUMINUM COILS, INCORPORATED

864 MILLER ROAD ● AVON, OHIO 44011
440/934-6550 - FAX 440/934-6558

## *FAX TRANSMISSION*

DATE: 11/30/11

COMPANY: TemPay Inc

TO: Brian Kelper    216 283 6796

FROM: John Barnes

COMMENTS:

Mr. Kelper,

Please consider this fax as confirmation of our earlier discussion today that our company has not engaged Bitroz Staffing to provide any services.

Further, we do not have an employee named Joanne Wilson or operate from a PO Box in Clearwater, Florida.

Sincerely.

John Barnes
Controller

**COMPOSITE EXHIBIT F**

www.sunbiz.org - Department of State                                      Page 1 of 1



## FLORIDA DEPARTMENT OF STATE
## DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Previous on List     Next on List     Return to List                    Fictitious Name Search

No Filing History                                                        [ Submit ]

# Fictitious Name Detail

## Fictitious Name

ALUMINUM COILS

## Filing Information

| | |
|---|---|
| Registration Number | G10000022087 |
| Status | ACTIVE |
| Filed Date | 03/09/2010 |
| Expiration Date | 12/31/2015 |
| Current Owners | 1 |
| County | HILLSBOROUGH |
| Total Pages | 1 |
| Events Filed | NONE |
| FEI/EIN Number | NONE |

## Mailing Address

11928 SHELDON ROAD
TAMPA, FL 33626

## Owner Information

STAFFING, OTTO BILTRES
11928 SHELDON ROAD
TAMPA, FL 33626
FEI/EIN Number: NONE
Document Number: NONE

## Document Images

03/09/2010 -- Fictitious Name Filing [ View Image in PDF format ]

Note: This is not official record. See documents if question or conflict.

Previous on List     Next on List     Return to List                    Fictitious Name Search

No Filing History                                                        [ Submit ]

| Home | Contact us | Document Searches | E-Filing Services | Forms | Help |

Copyright© and Privacy Policies
State of Florida, Department of State

## APPLICATION FOR REGISTRATION OF FICTITIOUS NAME

REGISTRATION# G10000022087

**Fictitious Name to be Registered:** ALUMINUM COILS

**Mailing Address of Business:**      11928 SHELDON ROAD
                                      TAMPA, FL  33626

**Florida County of Principal Place of Business:** HILLSBOROUGH

**FEI Number:**

**Owner(s) of Fictitious Name:**

STAFFING, OTTO B
11928 SHELDON ROAD
TAMPA, FL  33626    US

**FILED**
**Mar 09, 2010**
**Secretary of State**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in Chapter 50, Florida Statutes, in the county where the principal place of business is located.  I understand that the electronic signature below shall have the same legal effect as if made under oath.

OTTO BILTRES STAFFING, OWNER                          03/09/2010
_____          _____
     Electronic Signature(s)                              Date

**Certificate of Status Requested ( )**        **Certified Copy Requested (X)**

www.sunbiz.org - Department of State



# FLORIDA DEPARTMENT OF STATE
# DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Previous on List   Next on List   Return to List

No Filing History

Fictitious Name Search

Submit

## Fictitious Name Detail

### Fictitious Name

RBA PRINT COMMUNICATIONS

### Filing Information

| | |
|---|---|
| Registration Number | G10000022090 |
| Status | ACTIVE |
| Filed Date | 03/09/2010 |
| Expiration Date | 12/31/2015 |
| Current Owners | 1 |
| County | HILLSBOROUGH |
| Total Pages | 1 |
| Events Filed | NONE |
| FEI/EIN Number | NONE |

### Mailing Address

11928 SHELDON ROAD
TAMPA, FL 33626

### Owner Information

BILTRES, JR., OTTO S.
11928 SHELDON ROAD
TAMPA, FL 33626
FEI/EIN Number: NONE
Document Number: NONE

### Document Images

03/09/2010 -- Fictitious Name Filing   View Image in PDF format

Note: This is not official record. See documents if question or conflict.

Previous on List   Next on List   Return to List

No Filing History

Fictitious Name Search

Submit

| Home | Contact us | Document Searches | E-Filing Services | Forms | Help |

Copyright© and Privacy Policies
State of Florida, Department of State

## <u>APPLICATION FOR REGISTRATION OF FICTITIOUS NAME</u>

REGISTRATION# G10000022090

**Fictitious Name to be Registered:**  RBA PRINT COMMUNICATIONS

**Mailing Address of Business:**          11928 SHELDON ROAD
                                          TAMPA, FL  33626

**Florida County of Principal Place of Business:** HILLSBOROUGH

**FEI Number:**

**Owner(s) of Fictitious Name:**

    BILTRES, JR., OTTO S
    11928 SHELDON ROAD
    TAMPA, FL  33626    US

**FILED**
**Mar 09, 2010**
**Secretary of State**

I the undersigned, being an owner in the above fictitious name, certify that the information indicated on this form is true and accurate. I further certify that the fictitious name to be registered has been advertised at least once in a newspaper as defined in Chapter 50, Florida Statutes, in the county where the principal place of business is located.  I understand that the electronic signature below shall have the same legal effect as if made under oath.

OTTO S. BILTRES, JR., OWNER _____          03/09/2010 _____
    Electronic Signature(s)                                    Date

**Certificate of Status Requested ( )**        **Certified Copy Requested (X)**

**EXHIBIT G**



FLORIDA DEPARTMENT OF STATE
DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |

Previous on List    Next on List    Return To List

Events    No Name History

Entity Name Search

Submit

# Detail by Entity Name

## Florida Limited Liability Company

BILTRES STAFFING OF TAMPA BAY, LLC

## Filing Information

**Document Number** L08000005962
**FEI/EIN Number** 261744377
**Date Filed** 01/17/2008
**State** FL
**Status** ACTIVE
**Effective Date** 01/17/2008
**Last Event** LC AMENDMENT
**Event Date Filed** 04/24/2009
**Event Effective Date** NONE

## Principal Address

11928 SHELDON ROAD SUITE 102
TAMPA FL 33626

Changed 01/04/2010

## Mailing Address

1272 JASMINE LAKE DR
TARPON SPRINGS FL 34689

Changed 12/22/2008

## Registered Agent Name & Address

BILTRES, CONSTANDINA I
1272 JASMINE LAKE DR
TARPON SPRINGS FL 34689 US

Name Changed: 01/04/2010

Address Changed: 12/22/2008

## Manager/Member Detail

**Name & Address**

Title MGRM

BILTRES, CONSTANDINA I
1272 JASMINE LAKE DRIVE
TARPON SPRINGS FL 34689

## Annual Reports

**Report Year Filed Date**
2009    01/05/2009
2010    01/04/2010
2011    01/04/2011

## Document Images

01/04/2011 -- ANNUAL REPORT    View image in PDF format

www.sunbiz.org - Department of State

| | |
|---|---|
| 01/04/2010 -- ANNUAL REPORT | View image in PDF format |
| 04/24/2009 -- LC Amendment | View image in PDF format |
| 01/05/2009 -- ANNUAL REPORT | View image in PDF format |
| 12/22/2008 -- LC Amendment | View image in PDF format |
| 12/22/2008 -- Reg. Agent Change | View image in PDF format |
| 02/26/2008 -- Reg. Agent Change | View image in PDF format |
| 01/17/2008 -- Florida Limited Liability | View image in PDF format |

Note: This is not official record. See documents if question or conflict.

Previous on List    Next on List    Return To List

Events    No Name History

Entity Name Search

Submit

| Home | Contact us | Document Searches | E-Filing Services | Forms | Help |

Copyright © and Privacy Policies
State of Florida, Department of State

L08000005962

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP      ☐ WAIT      ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____   Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



400151722204

04/24/09--01016--014   **30.00

FILED
09 APR 24 PM 12:49
SECRETARY OF STATE
TALLAHASSEE FLORIDA

# COVER LETTER

**TO:** 'Registration Section
     Division of Corporations

**SUBJECT:** Biltres Staffing of Tampa Bay, LLC
     (Name of Limited Liability Company)

The enclosed Articles of Amendment and fee(s) are submitted for filing.

Please return all correspondence concerning this matter to the following:

Constandina I. Biltres
(Name of Person)

Biltres Staffing of Tampa Bay, LLC
(Firm/Company)

1272 Jasmine Lake Drive
(Address)

Tarpon Springs, Florida 34689
(City/State and Zip Code)

For further information concerning this matter, please call:

Constandina I. Biltres at (813) 598-6372
(Name of Person)              (Area Code & Daytime Telephone Number)

Enclosed is a check for the following amount:

☐ $25.00 Filing Fee    ☒ $30.00 Filing Fee &    ☐ $55.00 Filing Fee &    ☐ $60.00 Filing Fee,
                            Certificate of Status      Certified Copy              Certificate of Status &
                                                       (additional copy is enclosed)   Certified Copy
                                                                                      (additional copy is enclosed)

**MAILING ADDRESS:**              **STREET/COURIER ADDRESS:**
Registration Section              Registration Section
Division of Corporations          Division of Corporations
P.O. Box 6327                     Clifton Building
Tallahassee, FL 32314             2661 Executive Center Circle
                                  Tallahassee, FL 32301

# ARTICLES OF AMENDMENT
## TO
## ARTICLES OF ORGANIZATION
## OF

*FILED*

*09 APR 24  PH 12: 49*

*SECRETARY OF STATE*
*TALLAHASSEE FLORIDA*

Biltres Staffing of Tampa Bay, LLC

(Name of the Limited Liability Company as it now appears on our records.)
(A Florida Limited Liability Company)

The Articles of Organization for this Limited Liability Company were filed on ___01/17/2008___ and assigned

Florida document number ___L 08000005962___

This amendment is submitted to amend the following:

**A.** If amending name, <u>enter the new name of the limited liability company here:</u>

_____

The new name must be distinguishable and end with the words "Limited Liability Company," the designation "LLC" or the abbreviation "L.L.C."

**Enter new principal offices address, if applicable:**

***(Principal office address MUST BE A STREET ADDRESS)***

**Enter new mailing address, if applicable:**

***(Mailing address MAY BE A POST OFFICE BOX)***

**B.** If amending the registered agent and/or registered office address on our records, <u>enter the name of the new registered agent and/or the new registered office address here:</u>

<u>Name of New Registered Agent:</u>  Constandina I. Biltres

<u>New Registered Office Address:</u>  1272 Jasmine Lake Drive
(Enter Florida street address)

Tarpon Springs , Florida 34689
(City)  (Zip Code)

<u>New Registered Agent's Signature, if changing Registered Agent:</u>

*I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent as provided for in Chapter 608, F.S. Or, if this document is being filed to merely reflect a change in the registered office address, I hereby confirm that the limited liability company has been notified in writing of this change.*

(If Changing Registered Agent, Signature of New Registered Agent)

**Page 1 of 2**

✳ Please See Next Page

If amending the Managers or Managing Members on our records, <u>enter the title, name, and address of each Manager</u> <u>or Managing Member being added or removed from our records:</u>

**MGR = Manager**
**MGRM = Managing Member**

Remove

| Title | Name | Address | Type of Action |
|---|---|---|---|
| MGRM | Otto S. Biltres Jr. | 1272 Jasmine Lake Drive <br> Tarpon Springs, FL. 34689 | ☐ Add <br> ☒ Remove |
| MGRM | Constandina I. Biltres | 1272 Jasmine Lake Drive <br> Tarpon Springs, FL. 34689 | ☒ Add <br> ☐ Remove |
| | | | ☐ Add <br> ☐ Remove |
| | | | ☐ Add <br> ☐ Remove |
| | | | ☐ Add <br> ☐ Remove |
| | | | ☐ Add <br> ☐ Remove |

ADD

Biltres

**D.  If amending any other information, enter change(s) here:**  *(Attach additional sheets, if necessary.)*

Constandina I. Mougros  is now  Constandina I. Biltres
recently got married, Please change last name
that is on file under Biltres Staffing of Tampa Bay, LLC.
Constandina's last name also needs to be changed
Under the Registered Agent to Constandina I. Biltres

Dated  April 22nd , 2009 .

_____
Signature of a member or authorized representative of a member

Constandina I. Biltres
Typed or printed name of signee

FILED 09 APR 24  PM 12:49
SECRETARY OF STATE
TALLAHASSEE FLORIDA

**Page 2 of 2**

**Filing Fee: $25.00**

**COMPOSITE EXHIBIT H**

Loan Payment Log – CONSTANDINA 1MOUGROS 6619030016 1/09/2012

Page 1

| Effective date | Payment due date | Transaction | Transaction amt | Principal amt | Principal bal | Interest amt | Escrow amt | Escrow bal | Curtailment amt | Late chg amt | Late chg bal | Fee amt | Fee bal | Unapplied amt | Unapplied bal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/13/11 | 10/1/12 | Disbursement - Escrow/Assistance, disb batch 1121094, to Borrower, $621.44, Check #1554303 | ($621.44) | | $167,220.52 | $0.00 | ($621.44) | $4,565.55 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/8/11 | 9/1/12 | Loan Payment, due date=9/1/2012, From reversed | $1,503.13 | ($362.79) | $167,220.52 | $680.81 | $459.53 | $5,186.99 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/8/11 | 8/1/12 | Loan Payment, due date=8/1/2012, From reversed | $1,503.13 | ($361.32) | $167,583.31 | $682.28 | $459.53 | $4,727.46 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/8/11 | 7/1/12 | Loan Payment, due date=7/1/2012, From reversed | $1,503.13 | ($359.86) | $167,944.63 | $683.74 | $459.53 | $4,267.93 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/1/11 | 7/1/12 | Reversal - Misapplied Loan Payment, due date=7/1/2012, Easy pay, curtailment only, $4,509.39 | ($4,509.39) | $4,509.39 | $168,304.49 | $0.00 | $0.00 | $3,808.40 | ($4,509.39) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/1/11 | 7/1/12 | Loan Payment, due date=7/1/2012, Easy pay, curtailment only, $4,509.39 | $4,509.39 | ($4,509.39) | $163,795.10 | $0.00 | $0.00 | $3,808.40 | $4,509.39 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/1/11 | 6/1/12 | Loan Payment, due date=6/1/2012, Easy pay | $1,503.13 | ($358.41) | $168,304.49 | $685.19 | $459.53 | $3,808.40 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/1/11 | 6/1/12 | Payment - Phone Pay Fee, due date=12/1/2011, amt=$15.00 | $15.00 | | $168,662.90 | $0.00 | $0.00 | $3,348.87 | $0.00 | $0.00 | $0.00 | ($15.00) | $0.00 | $0.00 | $0.00 |
| 12/1/11 | 6/1/12 | Assessment - Phone Pay Fee, due date=12/1/2011, amt=$15.00 | ($15.00) | | $168,662.90 | $0.00 | $0.00 | $3,348.87 | $0.00 | $0.00 | $0.00 | $15.00 | $15.00 | $0.00 | $0.00 |
| 11/30/11 | 5/1/12 | Loan Payment, due date=5/1/2012, From unapplied | $1,503.13 | ($356.96) | $168,662.90 | $686.64 | $459.53 | $3,348.87 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,503.13) | $0.00 |
| 11/30/11 | 4/1/12 | Loan Payment, due date=4/1/2012, From unapplied | $1,503.13 | ($355.51) | $169,019.86 | $688.09 | $459.53 | $2,889.34 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,503.13) | $1,503.13 |
| 11/30/11 | 4/1/12 | Reversal - Misapplied Loan Payment, due date=4/1/2012, From unapplied, curtailment only, $3,006.26 | ($3,006.26) | $3,006.26 | $166,369.11 | $0.00 | $0.00 | $2,429.81 | ($3,006.26) | $0.00 | $0.00 | $0.00 | $0.00 | $3,006.26 | $3,006.26 |
| 11/30/11 | 4/1/12 | Loan Payment, due date=4/1/2012, From unapplied, curtailment only, $3,006.26 | $3,006.26 | ($3,006.26) | $169,375.37 | $0.00 | $0.00 | $2,429.81 | $3,006.26 | $0.00 | $0.00 | $0.00 | $0.00 | ($3,006.26) | $0.00 |
| 11/30/11 | 3/1/12 | Loan Payment, due date=3/1/2012, From unapplied | $1,503.13 | ($354.07) | $169,375.37 | $689.53 | $459.53 | $2,429.81 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,503.13) | $1,503.13 |
| 11/30/11 | 2/1/12 | Loan Payment, due date=2/1/2012, From unapplied | $1,503.13 | ($352.64) | $169,729.44 | $690.96 | $459.53 | $1,970.28 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,503.13) | $1,503.13 |
| 11/30/11 | 1/1/12 | Loan Payment, due date=1/1/2012, From unapplied | $1,503.13 | ($351.21) | $170,082.08 | $692.39 | $459.53 | $1,510.75 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,503.13) | $1,503.13 |
| 11/30/11 | 12/1/11 | Loan Payment, due date=12/1/2011, From unapplied | $1,503.13 | ($349.79) | $170,433.29 | $693.81 | $459.53 | $1,051.22 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($1,503.13) | $1,503.13 |
| 11/30/11 | 12/1/11 | Loan Payment - Unapplied, due date=12/1/2011, Easy pay, unapplied only, $9,018.78 | $9,018.78 | $0.00 | $170,783.08 | $0.00 | $0.00 | $591.69 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $9,018.78 | $9,018.78 |
| 11/30/11 | 12/1/11 | Payment - Phone Pay Fee, due date=11/1/2011, amt=$20.00 | $20.00 | | $170,783.08 | $0.00 | $0.00 | $591.69 | $0.00 | $0.00 | $0.00 | ($20.00) | $0.00 | $0.00 | $0.00 |
| 11/14/11 | 12/1/11 | Assessment - Phone Pay Fee, due date=11/1/2011, amt=$20.00 | ($20.00) | | $170,783.08 | $0.00 | $0.00 | $591.69 | $0.00 | $0.00 | $0.00 | $20.00 | $20.00 | $0.00 | $0.00 |
| 11/14/11 | 12/1/11 | Disbursement - County taxes, pmt 1, due for November, disb batch 1103538, amt=$2,719.37 | ($2,719.37) | | $170,783.08 | $0.00 | ($2,719.37) | $591.69 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/7/11 | 12/1/11 | Loan Payment - ACH (monthly), due date=12/1/2011, ACH, curtailment only, $4,000.00 | $4,000.00 | ($4,000.00) | $170,783.08 | $0.00 | $0.00 | $3,311.06 | $4,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/7/11 | 11/1/11 | Loan Payment - ACH (monthly), due date=11/1/2011, ACH | $1,503.13 | ($332.19) | $174,783.08 | $711.41 | $459.53 | $3,311.06 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/5/11 | 11/1/11 | Loan Payment - ACH (monthly), due date=11/1/2011, ACH, curtailment only, $4,000.00 | $4,000.00 | ($4,000.00) | $175,115.27 | $0.00 | $0.00 | $2,851.53 | $4,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/5/11 | 10/1/11 | Loan Payment - ACH (monthly), due date=10/1/2011, ACH | $1,503.13 | ($314.67) | $179,115.27 | $728.93 | $459.53 | $2,851.53 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Loan Payment Log — CONSTANDINA I MOUGROS 6619030016 1/09/2012

Page 2

| Effective date | Payment due date | Transaction | Transaction amt | Principal amt | Principal bal | Interest amt | Escrow amt | Escrow bal | Curtailment amt | Late chg amt | Late chg bal | Fee amt | Fee bal | Unapplied amt | Unapplied bal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/6/11 | 10/1/11 | Loan Payment - ACH (monthly), due date=10/1/2011, ACH, curtailment only, $4,000.00 | $4,000.00 | ($4,000.00) | $179,429.94 | $0.00 | $0.00 | $2,392.00 | $4,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 9/6/11 | 9/1/11 | Loan Payment - ACH (monthly), due date=9/1/2011, ACH | $1,396.79 | ($297.21) | $183,429.94 | $746.39 | $353.19 | $2,392.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 8/5/11 | 8/1/11 | Loan Payment - ACH (monthly), due date=8/1/2011, ACH | $1,396.79 | ($296.01) | $183,727.15 | $747.59 | $353.19 | $2,038.81 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/28/11 | 8/1/11 | Disbursement - Hazard insurance, disb batch - 1042259, to Florida Peninsula Insurance Company, | ($1,846.19) | $0.00 | $184,023.16 | $0.00 | ($1,846.19) | $1,685.62 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/5/11 | 7/1/11 | Loan Payment - ACH (monthly), due date=7/1/2011, ACH | $1,396.79 | ($294.81) | $184,023.16 | $748.79 | $353.19 | $3,531.81 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 6/6/11 | 6/1/11 | Loan Payment - ACH (monthly), due date=6/1/2011, ACH | $1,396.79 | ($293.62) | $184,317.97 | $749.98 | $353.19 | $3,178.62 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 5/5/11 | 5/1/11 | Loan Payment - ACH (monthly), due date=5/1/2011, ACH | $1,396.79 | ($292.43) | $184,611.59 | $751.17 | $353.19 | $2,825.43 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/5/11 | 5/1/11 | Loan Payment - ACH (monthly), due date=5/1/2011, ACH, curtailment only, $4,000.00 | $4,000.00 | ($4,000.00) | $184,904.02 | $0.00 | $0.00 | $2,472.24 | $4,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/5/11 | 4/1/11 | Loan Payment - ACH (monthly), due date=4/1/2011, ACH | $1,396.79 | ($275.06) | $184,904.02 | $768.54 | $353.19 | $2,472.24 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/7/11 | 4/1/11 | Loan Payment - ACH (monthly), due date=4/1/2011, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $188,904.02 | $0.00 | $0.00 | $2,119.05 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/7/11 | 3/1/11 | Loan Payment - ACH (monthly), due date=3/1/2011, ACH | $1,396.79 | ($273.54) | $189,179.08 | $770.06 | $353.19 | $2,119.05 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/7/11 | 3/1/11 | Loan Payment - ACH (monthly), due date=3/1/2011, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $189,279.08 | $0.00 | $0.00 | $1,765.86 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/7/11 | 2/1/11 | Loan Payment - ACH (monthly), due date=2/1/2011, ACH | $1,396.79 | ($272.03) | $189,552.62 | $771.57 | $353.19 | $1,765.86 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1/5/11 | 2/1/11 | Loan Payment - ACH (monthly), due date=2/1/2011, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $189,652.62 | $0.00 | $0.00 | $1,412.67 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1/5/11 | 1/1/11 | Loan Payment - ACH (monthly), due date=1/1/2011, ACH | $1,495.98 | ($270.53) | $189,924.65 | $773.07 | $452.38 | $1,412.67 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/9/10 | 1/1/11 | Disbursement - Escrow/Assistance, disb batch 903620, to Borrower, $276.93, Check #1354555 | ($276.93) | $0.00 | $190,024.65 | $0.00 | ($276.93) | $960.29 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/6/10 | 1/1/11 | Loan Payment - ACH (monthly), due date=1/1/2011, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $190,295.18 | $0.00 | $0.00 | $1,237.22 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/6/10 | 12/1/10 | Loan Payment - ACH (monthly), due date=12/1/2010, ACH | $1,495.98 | ($269.03) | $190,295.18 | $774.57 | $452.38 | $1,237.22 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/5/10 | 12/1/10 | Loan Payment - ACH (monthly), due date=12/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $190,395.18 | $0.00 | $0.00 | $784.84 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/5/10 | 11/1/10 | Loan Payment - ACH (monthly), due date=11/1/2010, ACH | $1,495.98 | ($267.53) | $190,664.21 | $776.07 | $452.38 | $784.84 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/4/10 | 11/1/10 | Disbursement - County taxes, pmt 1, due for November, disb batch 384045, amt=$3,030.05, Check | ($3,030.05) | $0.00 | $190,764.21 | $0.00 | ($3,030.05) | $332.46 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/5/10 | 11/1/10 | Loan Payment - ACH (monthly), due date=11/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $191,031.74 | $0.00 | $0.00 | $3,362.51 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/5/10 | 10/1/10 | Loan Payment - ACH (monthly), due date=10/1/2010, ACH | $1,495.98 | ($266.05) | $191,131.74 | $777.55 | $452.38 | $3,362.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 9/7/10 | 10/1/10 | Loan Payment - ACH (monthly), due date=10/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $191,397.79 | $0.00 | $0.00 | $2,910.13 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 9/7/10 | 9/1/10 | Loan Payment - ACH (monthly), due date=9/1/2010, ACH | $1,495.98 | ($264.57) | $191,497.79 | $779.03 | $452.38 | $2,910.13 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Loan Payment Log – CONSTANDINA I MOUGROS 6619030016 1/09/2012

Page 3

| Effective date | Payment due date | Transaction | Transaction amt | Principal amt | Principal bal | Interest amt | Escrow amt | Escrow bal | Late chg amt | Late chg bal | Fee amt | Fee bal | Unapplied amt | Unapplied bal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/5/10 | 9/1/10 | Loan Payment - ACH (monthly), due date=9/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $191,762.36 | $0.00 | $0.00 | $2,457.75 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 8/5/10 | 8/1/10 | Loan Payment - ACH (monthly), due date=8/1/2010, ACH | $1,495.98 | ($263.09) | $191,862.36 | $780.51 | $452.38 | $2,457.75 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/29/10 | 8/1/10 | Disbursement - Hazard insurance, disb batch - 832121, to Florida Peninsula Insurance Company, amt= | ($1,208.15) | $0.00 | $192,125.45 | $0.00 | ($1,208.15) | $2,005.37 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/5/10 | 7/1/10 | Loan Payment - ACH (monthly), due date=7/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $192,125.45 | $0.00 | $0.00 | $3,213.52 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/5/10 | 7/1/10 | Loan Payment - ACH (monthly), due date=7/1/2010, ACH | $1,495.98 | ($261.62) | $192,225.45 | $781.98 | $452.38 | $3,213.52 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 6/7/10 | 6/1/10 | Loan Payment - ACH (monthly), due date=6/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $192,487.07 | $0.00 | $0.00 | $2,761.14 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 6/7/10 | 6/1/10 | Loan Payment - ACH (monthly), due date=6/1/2010, ACH | $1,495.98 | ($260.16) | $192,587.07 | $783.44 | $452.38 | $2,761.14 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 5/5/10 | 5/1/10 | Loan Payment - ACH (monthly), due date=5/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $192,847.23 | $0.00 | $0.00 | $2,308.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 5/5/10 | 5/1/10 | Loan Payment - ACH (monthly), due date=5/1/2010, ACH | $1,495.98 | ($258.70) | $192,947.23 | $784.90 | $452.38 | $2,308.76 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/5/10 | 4/1/10 | Loan Payment - ACH (monthly), due date=4/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $193,205.93 | $0.00 | $0.00 | $1,856.38 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/5/10 | 4/1/10 | Loan Payment - ACH (monthly), due date=4/1/2010, ACH | $1,495.98 | ($257.25) | $193,305.93 | $786.35 | $452.38 | $1,856.38 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/5/10 | 3/1/10 | Loan Payment - ACH (monthly), due date=3/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $193,563.18 | $0.00 | $0.00 | $1,404.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/5/10 | 3/1/10 | Loan Payment - ACH (monthly), due date=3/1/2010, ACH | $1,495.98 | ($255.80) | $193,663.18 | $787.80 | $452.38 | $1,404.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/5/10 | 2/1/10 | Loan Payment - ACH (monthly), due date=2/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $193,918.98 | $0.00 | $0.00 | $951.62 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2/5/10 | 2/1/10 | Loan Payment - ACH (monthly), due date=2/1/2010, ACH | $1,495.98 | ($254.36) | $194,018.98 | $789.24 | $452.38 | $951.62 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1/5/10 | 1/1/10 | Loan Payment - ACH (monthly), due date=1/1/2010, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $194,273.34 | $0.00 | $0.00 | $499.24 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1/5/10 | 1/1/10 | Loan Payment - ACH (monthly), due date=1/1/2010, ACH | $1,352.67 | ($252.93) | $194,373.34 | $790.67 | $309.07 | $499.24 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/7/09 | 12/1/2009 | Loan Payment - ACH (monthly), due date=12/1/2009, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $194,626.27 | $0.00 | $0.00 | $190.17 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 12/7/09 | 12/1/2009 | Corp Adv Pmt - Escrow Advance (borrower), amt=$118.90 | $0.00 | $0.00 | $194,726.27 | $0.00 | ($118.90) | $190.17 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/12/09 | 12/1/2009 | Loan Payment - ACH (monthly), due date=12/1/2009, ACH | $1,352.67 | ($251.50) | $194,726.27 | $792.10 | $309.07 | $309.07 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/12/09 | 11/12/09 | Corp Adv Assessment - Escrow Advance (borrower), amt=$118.90 | $0.00 | $0.00 | $194,977.77 | $0.00 | $118.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/12/09 | 11/12/09 | Disbursement - County taxes, pmt 1, due for November, disb batch 677501, amt=$3,305.50, Check | ($3,305.50) | $0.00 | $194,977.77 | $0.00 | ($3,305.50) | ($118.90) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/5/09 | 11/1/2009 | Loan Payment - ACH (monthly), due date=11/1/2009, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $194,977.77 | $0.00 | $0.00 | $3,186.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/5/09 | 11/1/2009 | Loan Payment - ACH (monthly), due date=11/1/2009, ACH | $1,352.67 | ($250.08) | $195,077.77 | $793.52 | $309.07 | $3,186.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 10/5/09 | 11/1/2009 | Loan Payment - ACH (monthly), due date=11/1/2009, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $195,327.85 | $0.00 | $0.00 | $2,877.53 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Loan Payment Log – CONSTADINA I MOUGROS 6619030016 1/09/2012

Page 4

| Effective date | Payment due date | Transaction | Transaction amt | Principal amt | Principal bal | Interest amt | Escrow amt | Escrow bal | Curtailment amt | Late chg amt | Late chg bal | Fee amt | Fee bal | Unapplied amt | Unapplied bal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/5/09 | 10/1/09 | Loan Payment - ACH (monthly), due date=10/1/2009, ACH | $1,352.67 | ($248.66) | $195,427.85 | $794.94 | $309.07 | $2,877.53 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 9/8/09 | 10/1/09 | Loan Payment - ACH (monthly), due date=10/1/2009, ACH, curtailment only, $100.00 | $100.00 | ($100.00) | $195,676.51 | $0.00 | $0.00 | $2,568.46 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 9/8/09 | 9/1/09 | Loan Payment - ACH (monthly), due date=9/1/2009, ACH | $1,352.67 | ($247.25) | $195,776.51 | $796.35 | $309.07 | $2,568.46 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/30/09 | 9/1/09 | Loan Payment, due date=9/1/2009, Lockbox, curtailment only, $100.00 | $100.00 | ($100.00) | $196,023.76 | $0.00 | $0.00 | $2,259.39 | $100.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/30/09 | 8/1/09 | Loan Payment, due date=8/1/2009, Lockbox | $1,352.67 | ($245.85) | $196,123.76 | $797.75 | $309.07 | $2,259.39 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/30/09 | 8/1/09 | Disbursement - Hazard insurance, disb batch - 618066, to Florida Peninsula Insurance Company, amt= | ($1,140.38) | $0.00 | $196,369.61 | $0.00 | ($1,140.38) | $1,950.32 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/3/09 | 8/1/09 | Loan Payment, due date=8/1/2009, Lockbox, curtailment only, $100.01 | $100.01 | ($100.01) | $196,369.61 | $0.00 | $0.00 | $3,090.70 | $100.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 7/3/09 | 7/1/09 | Loan Payment, due date=7/1/2009, Lockbox | $1,352.67 | ($244.45) | $196,469.62 | $799.15 | $309.07 | $3,090.70 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 5/29/09 | 6/1/09 | Loan Payment, due date=6/1/2009, Lockbox | $1,352.67 | ($243.46) | $196,714.07 | $800.14 | $309.07 | $2,781.63 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 4/28/09 | 5/1/09 | Loan Payment, due date=5/1/2009, Lockbox | $1,352.67 | ($242.47) | $196,957.53 | $801.13 | $309.07 | $2,472.56 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3/24/09 | 5/1/09 | New Loan - From Origination | $0.00 | $0.00 | $197,200.00 | $0.00 | $0.00 | $2,163.49 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

H

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Page 1 of 7
Statement Period
11-23-11 through 12-22-11
B 15 E I E PI 15          0093114

Account Number: ▓▓▓▓▓▓▓

23075 E01 SCM999 I   4 0

CONSTANDINA I BILTRES
POA OTTO S BILTRES JR
1272 JASMINE LAKE DR
TARPON SPRINGS, FL  34689-5264

Our Online Banking service allows you to check balances, track account activity and more.
With Online Banking you can also view up to 18 months of this statement
online and even turn off delivery of your paper statement.
Enroll at www.bankofamerica.com.

Customer Service Information
www.bankofamerica.com

Deposit Accounts

## Adv Tiered Interest Chkg

CONSTANDINA I BILTRES  POA OTTO S BILTRES JR

## Your Account at a Glance

| | | |
|---|---|---|
| Account Number | ▓▓▓▓▓ | |
| Beginning Balance on 11-23-11 | $ | 418,562.86 |
| Deposits and Other Additions | + | 446,304.71 |
| Checks Posted | - | 90.00 |
| ATM and Debit Card Subtractions | - | 1,911.45 |
| Service Charges and Other Fees | - | 100.00 |
| Other Subtractions | - | 861,244.88 |
| Ending Balance on 12-22-11 | $ | 1,521.24 |

*Annual Percentage Yield Earned this Statement
Period:  0.10%
Interest Paid Year to Date:  $150.40*

H

CONSTANDINA I BILTRES
POA OTTO S BILTRES JR

Account Number: ███████

## Adv Tiered Interest Chkg Additions

| Deposits and Other Additions | Date Posted | Amount($) |
|---|---|---|
| Paypal        Des:Transfer    ID:52Ej25DC5Dj52 | 11-25 | 2,626.40 |
| Indn:Biltres Staffing Of Ta  Co ID:Paypalsd11 Ppd | | |
| BkofAmerica ATM 11/28 #000004087 Deposit | 11-28 | 20.00 |
| Citrus Park       Tampa        FL | | |
| Tempay Inc      Des:Credits      ID:Bst | 11-29 | 53,515.61 |
| Indn:Constandina I Biltres    Co ID:9104265000 Ppd | | |
| FL Tlr transfer | 11-30 | 380,534.49 |
| Banking Ctr Downtown Tampa         #0001031 FL | | |
| Confirmation# 3067590385 | | |
| Schbrd Hillscnty Des:Net.Salary ID:0101-000132034 | 12-02 | 1,626.86 |
| Indn:Biltres       Constan  Co ID:1596000660 Ppd | | |
| Paypal        Des:Transfer    ID:52Ej25E5Ze8Bq | 12-05 | 3,356.59 |
| Indn:Biltres Staffing Of Ta  Co ID:Paypalsd11 Ppd | | |
| Paypal        Des:Transfer    ID:52Ej25Bnjb54A | 12-08 | 3,093.52 |
| Indn:Biltres Staffing Of Ta  Co ID:Paypalsd11 Ppd | | |
| Schbrd Hillscnty Des:Net.Salary ID:0101-000132034 | 12-16 | 1,519.92 |
| Indn:Biltres       Constan  Co ID:1596000660 Ppd | | |
| Interest Earned | 12-22 | 11.32 |

**Total Deposits and Other Additions $446,304.71**

## Adv Tiered Interest Chkg Subtractions

| Check # | Posting Date | Amount($) | Check # | Posting Date | Amount($) |
|---|---|---|---|---|---|
| 9052 | 11-30 | 30.00 | 9055* | 12-05 | 60.00 |

**Total Checks Posted $90.00**

* Gap in sequential check numbers.

| ATM and Debit Card Subtractions | Date Posted | Amount($) |
|---|---|---|
| Stop & Shop #5  11/25 #000933477 Purchase | 11-25 | 39.37 |
| Stop & Shop #501    W Harrison   NY | | |
| Publix Super M  11/28 #000610168 Purchase | 11-28 | 132.25 |
| Publix Super Mar   Tarpon Spring FL | | |
| Publix Super M  11/28 #000602064 Purchase | 11-28 | 31.29 |
| Publix Super Mar   Tarpon Spring FL | | |
| CheckCard  1125 Wp Parking Department | 11-28 | 6.25 |
| 9144221232   NY 24733091329400811000784 | | |
| BkofAmerica ATM 11/29 #000007826 Withdrwl | 11-29 | 600.00 |
| Tarpon Mall     Tarpon Mall   FL | | |
| Publix Super M  11/29 #000322076 Purchase | 11-29 | 343.65 |
| Publix Super Mar   Tarpon Spring FL | | |
| Big Lots #0056  11/30 #000906153 Purchase | 11-30 | 42.80 |
| Big Lots #00564     Tarpon Spring FL | | |
| CheckCard  1201 Toysrus-Babiesrus | 12-02 | 53.48 |
| 800-Toysrus  PA 24610431335004035003059 | | |
| CheckCard  1203 Walmart.Com 8009666546 | 12-05 | 133.32 |
| 800-966-6546 AR 24055231337083325853229 | | |
| 415 Minas       12/05 #000860194 Purchase | 12-05 | 56.94 |
| 415 Minas           Tampa        FL | | |

CONSTANDINA I BILTRES
POA OTTO S BILTRES JR

Page 3 of 7
Statement Period
11-23-11 through 12-22-11
B 15 E I E PI  15        0093116

Account Number: ▮▮▮▮▮▮▮▮

## Adv Tiered Interest Chkg Subtractions

| ATM and Debit Card Subtractions - Continued | Date Posted | Amount($) |
|---|---|---|
| Jcpenney Store  12/04 #000872743 Purchase | 12-05 | 54.75 |
| Jcpenney Store 14  Clearwater      FL | | |
| Publix Super M  12/04 #000409901 Purchase | 12-05 | 46.30 |
| Publix Super Mar   Tarpon Spring FL | | |
| Target T0656 T  12/03 #000645187 Purchase | 12-05 | 12.83 |
| Target T0656 Targ  Tampa         FL | | |
| Jcpenney Store  12/04 #000388035 Purchase | 12-05 | 11.12 |
| Jcpenney Store 14  Clearwater    FL | | |
| CheckCard  1203 Panera Bread #3339 | 12-05 | 9.82 |
| Tampa        FL 24427331338710035215723 | | |
| CheckCard  1130 Parking Administration | 12-05 | 2.25 |
| Tampa        FL 24492801338436017927869 | | |
| 415 Minas        12/06 #000899471 Purchase | 12-06 | 32.45 |
| 415 Minas          Tampa      FL | | |
| CheckCard  1205 Sunpass Operations | 12-06 | 25.00 |
| 888-8655352  FL 24492801339118000107035 Recurring | | |
| CheckCard  1206 Mcdonald's F23594 | 12-07 | 8.31 |
| Tampa        FL 24427331340720036795348 | | |
| CheckCard  1205 Parking Administration | 12-08 | 1.50 |
| Tampa        FL 24492801341436018032771 | | |
| Wal-Mart #2796  12/09 #000155935 Purchase | 12-09 | 32.69 |
| Wal-Mart #2796    Oldsmar      FL | | |
| Shell Service  12/09 #000978835 Purchase | 12-09 | 1.39 |
| Shell Service Sta  Tampa      FL | | |
| CheckCard  1211 Jewelers Mutual Insura | 12-12 | 117.13 |
| 800-558-6411 WI 24692161345000919727138 | | |
| CheckCard  1210 Asia Nails | 12-12 | 32.00 |
| Tarpon Sprs  FL 24639231345900019600019 | | |
| CheckCard  1208 Shell Oil 57542034202 | 12-12 | 26.44 |
| Tampa        FL 24316051343548712038203 | | |
| CheckCard  1209 Papa Johns #1218 | 12-12 | 24.34 |
| 727-934-7272 FL 24761971344251129010067 | | |
| CheckCard  1210 Experian  *freecredrp | 12-12 | 16.95 |
| Infofor.com  CA 24351781344649411391666 Recurring | | |
| Walgreens 627  12/11 #000356010 Purchase | 12-12 | 12.17 |
| Walgreens 627 S P  Tarpon Spring FL | | |
| CheckCard  1209 Starbucks Corp00034827 | 12-12 | 2.41 |
| Tarpon Sprngsfl 24164071343355903248521 | | |
| CheckCard  1209 Parking Administration | 12-12 | 2.25 |
| Tampa        FL 24492801345436018168308 | | |

**Total ATM and Debit Card Subtractions $1,911.45**

| Service Charges and Other Fees | Date Posted | Amount($) |
|---|---|---|
| Wire Transfer Fee | 11-28 | 25.00 |
| Wire Transfer Fee | 11-29 | 25.00 |
| Wire Transfer Fee | 11-30 | 25.00 |
| Wire Transfer Fee | 11-30 | 25.00 |

**Total Service Charges and Other Fees $100.00**

CONSTANDINA I BILTRES
POA OTTO S BILTRES JR

## Adv Tiered Interest Chkg Subtractions

| Other Subtractions | Date Posted | Amount($) |
|---|---|---|
| American Express Des:Web Remit  ID:111125061518787 | 11-25 | 500.00 |
| Indn:Otto S Biltres          Co ID:1133133497 Web | | |
| Allstate Ins Co  Des:Ins Prem   ID:000000071881934 | 11-25 | 208.50 |
| Indn:Biltres                 Co ID:1360719665 Web | | |
| Privacy Assist  Des:8005169561 ID:Xxxxxxxxxoc | 11-25 | 12.99 |
| Indn:Biltres Otto S          Co ID:3521523496 Ppd | | |
| Keep The Change Transfer To Acct 7534 For 11/25/11 | 11-25 | 0.63 |
| Wire Type:Book Out Date:111128 Time:0626 Et | 11-28 | 10,000.00 |
| Trn:2011112800108715 Related Ref:69490174 | | |
| Bnf:Otto S Biltres Jr ID:229024856105 | | |
| Online Banking transfer to Chk 6105 | 11-28 | 9,500.00 |
| Conf# 5051986116; Biltres, Constandina | | |
| City of Tarpon S Des:UT Bill    ID:000479110002696 | 11-28 | 145.79 |
| Indn:Biltros, Otto S        Co ID:1596000437 Ppd | | |
| T-Mobile      Des:Pos Svc    ID:9101719 | 11-28 | 86.60 |
| Indn:Constandina Biltres     Co ID:0000450304 Web | | |
| Keep The Change Transfer To Acct 7534 For 11/28/11 | 11-28 | 2.21 |
| Wire Type:Book Out Date:111129 Time:0952 Et | 11-29 | 40,000.00 |
| Trn:2011112900131260 Related Ref:69598584 | | |
| Bnf:Otto S Biltres Jr ID:229024856105 | | |
| Keep The Change Transfer To Acct 7534 For 11/29/11 | 11-29 | 0.35 |
| Wire Type:Wire Out Date:111130 Time:1359 Et | 11-30 | 601,500.00 |
| Trn:2011113000241115 Service Ref:011329 | | |
| Bnf:Cohen Foster, P.A. ID:21070466 Bnf Bk:The Bank | | |
| Of Tampa ID:063108680 Pmt Det:01111130003490Nnflo | | |
| Rida Bar Foundation Iota | | |
| Wire Type:Book Out Date:111130 Time:1446 Et | 11-30 | 94,000.00 |
| Trn:2011113000260890 Related Ref:69685726 | | |
| Bnf:Otto S Biltres Jr ID:229024856105 | | |
| Keep The Change Transfer To Acct 7534 For 11/30/11 | 11-30 | 0.20 |
| Providentfunding Des:Provfund   ID:6619030016 | 12-01 | 9,038.78 |
| Indn:Constandina I Mougros   Co ID:9934551004 Tel | | |
| Mbfs.Com       Des:Auto Pay   ID:07002857448 | 12-01 | 473.89 |
| Indn:Mougros, Constandi I    Co ID:8751436001 Ppd | | |
| Providentfunding Des:Provfund   ID:6619030016 | 12-02 | 6,027.52 |
| Indn:Constandina I Mougros   Co ID:9934551004 Tel | | |
| T-Mobile      Des:Pos Svc    ID:9346079 | 12-02 | 311.84 |
| Indn:Otto Biltres            Co ID:0000450304 Web | | |
| Keep The Change Transfer To Acct 7534 For 12/02/11 | 12-02 | 0.52 |
| Bkamerica       Des:Ic Payment ID:063010026921826 | 12-05 | 580.67 |
| Indn:Biltres Ot 63110026921  Co ID:1400136115 Ppd | | |
| American Express Des:Web Remit  ID:111205060839361 | 12-05 | 500.00 |
| Indn:Otto S Biltres          Co ID:1133133497 Web | | |
| Paypal        Des:Inst Xfer  ID:52Bj25Eaj4Ag4 | 12-05 | 60.00 |
| Indn:Biltres Staffing Of Ta  Co ID:Paypalsi66 Web | | |
| Keep The Change Transfer To Acct 7534 For 12/05/11 | 12-05 | 3.67 |
| Aetna          Des:Aet Health ID:309884 | 12-06 | 333.00 |
| Indn:Biltres, Otto           Co ID:1232228683 Ppd | | |
| Barclaycard US  Des:Creditcard ID:Xxxxxxxxxx | 12-06 | 50.00 |
| Indn:Otto Biltres            Co ID:2510407970 Web | | |
| Macys Payment  Des:Check Pymt Check #:9054 | 12-06 | 50.00 |
| Indn:420609511930557         Co ID:1460358360 Arc | | |
| Keep The Change Transfer To Acct 7534 For 12/06/11 | 12-06 | 0.55 |

CONSTANDINA I BILTRES
POA OTTO S BILTRES JR

Page 5 of 7
Statement Period
11-23-11 through 12-22-11
B 15  B 1  E  PI    15          0093118

Account Number: ███████████

## Adv Tiered Interest Chkg Subtractions

| Other Subtractions - Continued | Date Posted | Amount($) |
|---|---|---|
| American Express Des:Web Remit  ID:111207062525545 | 12-07 | 1,000.00 |
|   Indn:Otto S Biltres          Co ID:1133133497 Web | | |
| Keep The Change Transfer To Acct 7534 For 12/07/11 | 12-07 | 0.69 |
| Level Ad Insuran Des:8668790179 ID:6105417 | 12-08 | 20.00 |
|   Indn:Otto S Biltres          Co ID:Ixxxxxxxxx Ppd | | |
| Keep The Change Transfer To Acct 7534 For 12/08/11 | 12-08 | 0.50 |
| Keep The Change Transfer To Acct 7534 For 12/09/11 | 12-09 | 0.92 |
| Transfer Constandina I Biltre:Otto Biltres | 12-12 | 200.00 |
|   Confirmation# 2571707449 | | |
| American Express Des:Am Pmt      ID:A3838 | 12-12 | 1,609.57 |
|   Indn:Otto Biltres          Co ID:3133133497 Web | | |
| American Express Des:Web Remit  ID:111210060928966 | 12-12 | 1,000.00 |
|   Indn:Otto S Biltres          Co ID:1133133497 Web | | |
| Keep The Change Transfer To Acct 7534 For 12/12/11 | 12-12 | 4.31 |
| Legal Order, Lts U121311001692 | 12-14 | 83,899.18 |
| Legal Order Fee,Lts U121311001692 | 12-14 | 100.00 |
| External transfer fee - Next Day - 12/12/2011 | 12-14 | 10.00 |
|   Confirmation: 70240942 | | |
| CheckCard  1213 Flippers Express Wash | 12-15 | 12.00 |
|   Tampa          FL  24512391347003256159575 | | |

**Total Other Subtractions $861,244.88**

## Daily Balance Summary

| Date | Balance($) | Date | Balance($) | Date | Balance($) |
|---|---|---|---|---|---|
| Beginning | 418,562.86 | 12-02 | 83,697.31 | 12-12 | 84,011.18 |
| 11-25 | 420,427.77 | 12-05 | 85,522.23 | 12-14 | 2.00 |
| 11-28 | 400,518.38 | 12-06 | 85,031.23 | 12-15 | 10.00- |
| 11-29 | 413,064.99 | 12-07 | 84,022.23 | 12-16 | 1,509.92 |
| 11-30 | 97,976.48 | 12-08 | 87,093.75 | 12-22 | 1,521.24 |
| 12-01 | 88,463.81 | 12-09 | 87,058.75 | | |